Moncure, P.
delivered the opinion of the court.
The court is of opinion, that the appellee, David T. Staples, executor of David Staples, had authority under the will of his testator,to sell the real estate of said testator, as he did on the ninth day of July 1862. The testator, by his said will, which bears date on the 19th day of February 1861, expressly directed all his estate to be sold “as soon as the times seem to justify a sale without sacrifice,” and the proceeds, without regard to any advancements theretofore made, to be equally divided amongst his children, namiug them, and who were eleven in number, the children of two of them who were dead to take per stirpes; and he appointed his son, the said David T. Staples, executor of his will, and directed that no security should be required of the said executor as such. The testator died on the 1st day of July 1861. His will was recorded, and his executor qualified on the 16th day of September 1861. His estate, real and personal, was inventoried and appraised on the 5th day of October 1861, and his real estate was sold, as aforesaid, on the 9th day of July 1862. At the date of his will, and at the time of his death, six of his children resided in Virginia, and it seems in the neighborhood in which *232 he died; and the remaining five,'including the children' of the two who were dead, resided in Misssouri, where they continued to reside until after the late civil war. The only question in regard to the authority of the executor to make, the said sale arises from the words of the will, which directed the sale to be made “as soon as the times seem to justify a sale without sacrifice.” It is argued that these words create a condition precedent which must take place to authorize a sale ; and that the said sale was made before the times seemed to justify a sale without sacrifice. But, who was to be the judge of that matter ? To whom did the testator refer the question as to when a sale might be made without sacrifice % Certainly to his executor, and to him only; who was one of his sons, and in whom, undoubtedly, he had great, confidence, as is evidenced by the fact not only that he selected him as his executor, but also that he directed no-security to be required in the executorial bond. He did not direct, nor seem to contemplate, that any resort should be had to a court of equity, to determine the-question as to the propriety of a sale; but left the matter exclusively to the discretion of his executor, who had himself a deep interest in the subject, and who was surrounded by brothers and sisters who were alike interested, and whom he would, naturally, advise with on the subject. The very nature and object of the trust required a sale in a short time, and as soon as one could be effected without a sacrifice. There could be no division among his numerous heirs without a sale, and they were equally entitled to the subject immediately. The fact that nearly half of them resided in a distant State increased the necessity for a speedy sale, supposing the time to be suitable, as the property could not continue to be held in kind to advantage under such circumstances. Of course he did not-wish the property to *233 be sacrificed by a premature sale, when, by waiting for a short time, such sacrifice might be avoided. But he wished the sale to be made as soon as it could be without sacrifice; for he so expressly said; that is, as soon as it could be so sold, in the opinion of his executor. These words, “as soon as the times seem to justify a sale without sacrifice,” seem to have been used, as much for the purpose of accelerating the sale as soon as it could be made without sacrifice, as for the purpose of showing that he did not require it to be made until, in the opinion of his executor, it could be done without'sacrifice. Probably, when the will was made, land in the testator’s-neighborhood was not very saleable, but was likely soon to become more so.
Then, the only remaining question in this branch of' the case, is: Bid the executor act in good faith, in making the sale at the time at which it was made ? Did the-times then seem to him to justify a sale? Did it seem, to him that a sale could then be made without sacrifice?
If he acted in good faith in making the sale, it was-valid, whether his judgment that a sale could then be-made without sacrifice was reasonable or not, under all the circumstances. And even if he acted in bad faith yet if the purchasers at the sale had no knowledge of the fact, but acted in good faith in making and completing their purchases, they acquired a good title to the land purchased by them respectively. But the court is of opinion that he acted in good faith in making the sale,, and that his judgment that a sale could then be made-without sacrifice, was reasonable, under all the circumstances. There is no evidence in the record, and there was no attempt by any body to show that the executor-acted in bad faith in making the 3ale. Though real estate may not have been very saleable in the neighbor *234 hood when the will was made, it became more so after-wards ; and about the time the sale was made, prudent men were making sales of their own land, with a view to 'their interest. That the sale was made for Confederate money> can make no difference : A sale could be made for no other money at.that time, nor at any time afterwards during the war. It was then very doubtful when the war would terminate, and there was no good reason to believe that it would terminate in any short time. The executor had deferred the sale until about a year after the testator’s death, and there seemed to be no good reason for deferring it any longer. Most, if not all of the heirs residing in Virginia desired a sale, and none of them opposed it. That nearly half in number of the heirs resided in Missouri, whose wishes on the subject were not known, makes no difference. Though they could not, in the then state of the country, receive their portions of the proceeds of sale, yet it was well hoped that they might be able to do so in a short time. The heirs living'in Virginia could receive their portions at any time, and those of the non-resident heirs it was no doubt believed, and reasonably believed, by the executor, could be held and secured for them until they could receive their portions. That sales of real estate might properly be, and were frequently made during the war, for Confederate money, under decrees of courts of chancery and by fiduciaries, where non-residents and persons under disability were concerned, has been established by repeated decisions of this court. Dixon & als. v. Mc Cue's adm'x als., 21 Gratt. 373; Walker's ex'or v. Page & als. Id. 636; Poague v. Greenlee's adm'r & als., 22 Id. 724. Though Confederate money had depreciated, and was perhaps still depreciating, at the time of the sale, yet most persons then hoped and believed that it would soon become better, and ultimately be worth its *235 par value. At least it was generally, if not universally believed, that Confederate bonds, in which Confederate money could at any time be readily invested, were a perfectly safe investment. Scarcely any body in the Confederate States then doubted the success of the Confederate cause, and perhaps every body believed that in that event those States would be able to pay, and would pay, the entire amount of their debts, great as they would certainly be.
The court is further of opinion, that the said sale was not void or voidable on the ground of inadequacy of price : and that the price at which the property was sold :at said sale, cannot be considered as inadequate, under the circumstances which then existed. There is no evidence in the record tending to show that any of the property sold did not produce its full value in Confederate money, on the terms on which it was sold. On the contrary, the evidence in the record affirmatively shows, that all of the said property produced its full value, in •such money and on said terms. The sale was duly advertised, and was well attended by bidders, and every effort in the power of the executor seems to have been used by him to promote the sale. Several of the other heirs were present, and none of them objected to the sale, but all seemed to be satisfied therewith. The price at whicii the property was sold in Confederate money converted into gold at its then market value, at the place where the sale was made, would have exceeded the appraisement price of the property; but we all know that at that time gold was a very scarce commodity and commanded very high price, and that Confederate money was often worth its par amount, or nearly so, in the payment of ante-war debts, or in the purchase of land or other property. In considering the question of inadequacy of price, the value of the Confederate money for *236 which the land was sold ought to be estimated as at the . time of the sale, and not as at the timeat which it became payable according to the terms of sale. Ho body anticipa,ted? at the time of the sale, that there would be any thing like so great a depreciation of Confederate money as afterwards occurred. On the contrary, most persons, perhaps, believed that its value would continue to be-about the same, and many no doubt believed that it would appreciate after a while. The fair mode of considering the subject is, to estimate the value of the price-in Confederate money as at the time of the sale. Tested by that rule, there was certainly no inadequacy of price..
The court is . further of opinion, that the executor was-not a purchaser of Mount Airy at his own sale; but that he purchased it afterwards of S. J. Turner, who, had purchased it at the executor’s sale; and that it was*-competent for the executor, acting in good faith, to become: such purchaser from S. J. Turner.
It is certainly well settled, as a'general rule, that ai trustee for the sale of property can not purchase it for his own benefit at his own sale, either directly by his own act, or indirectly by the interposition and agency of another; and that an executor is a trustee within the-meaning of the rule. But it is certainly true, that an executor or other trustee can lawfully purchase, for his own benefit, property, though it may have been previously purchased by his vendor of himself as such executor or other trustee; provided, of course, that the transaction be real and bona fide. ■ If the sale by the-trustee be a sham sale, of course it is fraudulent, and if not absolutely void, it can not enure to the- benefit of the trustee, but only to that of the cestui que trust: How the question in this case is, was S. J. Turner, to whom Mount Airy was cried out at the executor’s sale, a pur■chaser of that property for his own benefit and on his- *237 ■own account, or did he purchase it as the secret agent and for the benefit of the executor ?
Certainly S. J. Turner was the highest bidder for property, and it was cried out to him at the executor’s sale. He was in form and to all appearance the purchaser at that sale.' If, though in form acting for himself he was really acting for the benefit and as the agent of the executor, their object being to accomplish indirectly and secretly, what they knew they could not accomplish directly and openly, they were both guilty of a great fraud; but in order to establish such a fraud, the evidence ought at least to be very strong.
■ There is no such evidence if there be any evidence tending to prove such a fraud in this case. On the contrary, all the evidence in the case is consistent with the truth and integrity of the transaction. The account given of it by said Turner in his answer is as follows: “Respondent represents that Mount Airy was at the sale knocked out to him, and not to the said D. T. Staples. Respondent bought said place because he was anxious to secure it as a home to his mother-in-law, the widow of JDavid Staples, and his sister-in-law, then living with her mother. At the time of the sale he believed that he could prevail upon David T. Staples to take the purchase off his hands, though said D. T. Staples was very much averse to doing so, and had urged upon respondent and the other legatees not to sell Mount Airy, but allow it to remain for the present unsold; and be used as a home for their aged mother and their maiden sister. This arrangement was not assented to by the parties; they positively refusing so to do, and insisting that the property should be all sold together. Thereupon respondent determined to buy the property aforesaid; and having done so, prevailed on said Di T. Staples to take his shoes, which he did. Said D. T. Staples, as executor, first con- *238 v<Aec^ sa^ ’property to respondent, and respondent then conveyed it to him, and he afterwards conveyed it *° ^arQR' Respondent is sure that in respect to this purchase of Mount Airy, the said D. T. Staples acted from the purest motives, and with no view to his personal advantage. The old lady was very infirm, and her husband had made very inadequate provision for her. Respondent, under the circumstances, regarded it as the duty of her children to secure to.her a home, and on his part he made this purchase with a view to that end only.”
D. T. Staples, in his answer says: “ As to the sale of Mount Airy, charged in the bill to have been made by respondent to himself, he desires to refer to the answer of his co-defendant, Turner, which relates the truth of the case. Respondent never wished to purchase said property. He l ever would have consented to Turner’s proposition but for the earnest entreaties of the family, who were anxious that respondent should take the house, which was the old homestead, and allow their aged and very infirm mother to occupy it with himself and his unmarried sister. This step was rendered necessary fertile comfort of the old lady, the provision for her maintenance having become wholly inadequate early in the-war. The price at which said property sold was' its. full value at the time. A large company of land buyers was present at the sale, and every effort was made to-procure the fullest price.”
„ The evidence on this branch of the subject consisted, of the testimony of one witness, W A. Staples, examined in behalf of the plaintiff's, and three witnesses^ Bryan Akers, E. B. Mays and C. H. Rucker, examined in behalf of the Camps, the sub-purchasers of Mount. Airy from D. T. Staples.
On the one side, W. A Staples testified as follows i *239 “I was at the sale. Turner and Staples had some conversation about Mount Airy. Turner advised Staples to purchase it; that it would suit him. The replied he had no right to buy, being executor, &c.; intimated or expressed that it would suit him, &c.”
On the other side, Bryan Akers, who was the auctioneer that conducted the sale, testified as follows; “ There wae a large crowd present when the sale was made, and the prices obtained were considered good prices at that time, and I think were perfectly satisfactory to the legatees present. Mr. Turner, the son-in-law of David Staples, became the purchaser of the place called Mount Airy, and the price paid for it was then considered a good one. D. T. Staples, W. A. Staples, and one, if not both the Turners,(legatees of D. Staples,) were at the sale.” E. B. Mays (who had married a sister of S. J. Turner) testified that he was present at the sale. There was a large crowd present. At the time, the prices obtained were regarded as good. S. J. Turner became the purchaser of Mount Airy, and after the sale offered to sell it to the witness, but sold it to D. T. Staples to secure a home for his (the witness’s) wife’s mother, as said Turner told the witness. C. H. Rucker testified as follows: “ I was at the sale. I regarded the prices obtained as very good. I was a bidder for Mount Airy, and it sold for more than I was willing to pay for it. I ran it up, I think, above $7,000. I regarded it a good sale. I was pretty well acquainted with that property and had been over it a good deal. D. T. Staples, Jno. L. Turner and Samuel J. Turner, (legatees of David Staples,) were present at the sale. I do not remember whether W. A. Staples was present. (In fact he was.) I have never heard from any of the legatees that they objected to the sale. I was a purchaser of one piece of the property at the sale.”
*240 Thus it appears from the evidence, that S. JV Turner was, bona fide, the purchaser of Mount Airy, on his own at the executor’s sale; that after the sale he claimed it as his own property and exercised acts of °™hiP over firsb by offering to sell it to Mays, who married his sister; and then by selling it to D. T. Staples, who bought it as a home for his mother and sister; that this arrangement was agreeable to all the legatees who were present at the sale; and that the property produced the best possible price that could be obtained' for it, without being in the least degree influenced by the [fact that S. J. Turner was the purchaser at the sale, or the fact that D. T. Staples became a sub-purchaser from him; which latter fact had not then transpired, and of course could not then be known to the bidders at the sale.. It does not appear from the evidence that there was any agreement or understanding between D.T.Staples and S. J. Turner, when the latter became the purchaser of the property, that he would resell it to the former; and it is very clear that no such resale could have been enforced, if Turner had chosen to continue to own and hold the property. The subsequent purchase by D. T. Staples appears to have been voluntary on his part, induced by the laudable desire of himself and the other legatees who were present, to preserve the family residence as a home for their aged mother and maiden sister. Under these circumstances, there was nothing in the law to prevent these parties from making this humane arrangement, and it was competent for.D. T. ■Staples to purchase the property, as he did, from. S. J. Turner.
It was argued by the learned counsel for the appellants, that by making the purchase, D. T. Staples placed himself in a wrong position, in which his interest conflicted with his duty; that it then and thus became his interai *241 to accept Confederate money in discharge of the deferred instalments of the price of the property, however greatly the value of such money might depreciate in the mean time; while it might be his duty to refuse to receive it, on account of such depreciation. The books afford no authority for saying that such a circumstance will disable a trustee from purchasing property which had once constituted a part of the trust subject, and had been sold by him as such. S. J. Turner having become the bona fide purchaser of the property on his own account, could sell it to whomsoever he pleased, subject, of coui’se, to the payment of the purchase money due by him, and D. T. Staples had the same right to make the purchase of S. J. Turner that any other person had. It could no more make it to the interest of the executor to do wrong in the execution of jhis trust than a like purchase of property, at the same time and on the same terms, of any other person would have done; and nobody will say that it would have been incompetent for him to have made such a purchase. That an act may make it the interest of a trustee to do wrong,, does not, of itself, necessarily make the act unlawful. It may serve to put us on the alert, and cause us to scrutinize closely the conduct of the trustee; but the question, after all, is, whether the trustee has in fact done wrong or not. In this case, when the purchase was made by X). T. Staples of S. J. Turner, which was probably about the time of, though after the executor’s sale, it did not and could not appear that the purchase would make it the interest of the executor to do wrong, or influence his conduct as executor in any way. Hobody then knew that there would be any material depreciation of Confederate money when the deferred payments would mature, but most people hoped, and perhaps believed, that such would not be the case. Had they not so *242 hoped and believed they would not, about that time, have made sales of property for Confederate money, payable at future periods, without providing against the effect of such depreciation.
The court is further of opinion that D. T. Staples having lawfully become the purchaser of Mount Airy of S. J. Turner, had a right to resell it to the Camps, whose title, therefore, cannot be impeached: and this renders it unnecessary to consider the ground so much pressed by their learned counsel, in argument, that even if the purchase was made by S. J. Turner, at the executor’s sale, for the benefit of the executor himself, yet the Camps were bona fide subsequent purchasers without notice, and entitled, as such, to the property, against the claims of the appellants.
The court is further of opinion that D. T. Staples is chargeable with nothing on account of the resale by him of Mount Airy to the Camps. He would have been chargeable with nothing on account of such resale, even if he had made a profit by it; his conduct in the transaction having been fair and bona fide. But it appears that, so far from making a profit, he sustained a loss by it; for though the resale was for a larger amount, nominally, of Confederate money than he paid for it, yet, reducing the amounts both paid and received to good money or gold, at the times of such payments and receipts respectively, it appears by the commissioner’s report that the amount paid exceeded the amount received by $695.83.
The court is further of opinion that the executor, JD. T. Staples, did not commit a breach of trust in receiving Confederate money in payment of the deferred instalments of the purchase money of the real estate at the maturity of those instalments; and the purchasers at the sale, having in good faith paid the nominal amount of *243 the purchase money due by them; and the executor having in good faith received such payment in full discharge of said purchase money, and executed the proper conveyanees, the said purchasers became entitled, in law and equity, to the property purchased by them respectively; and their title thereto cannot, therefore, be impeached.
The contracts of sale by the executor in this case being made on the 9th day of July 1862, though made for so many dollars merely, were, no doubt, according to the true understanding and agreement of the parties to be fulfilled or performed in Confederate States treasury notes, or were entered into with reference to such notes as a standard of value; and if the purchase money had not been fully paid during the war, the case would have come within the operation of the adjustment acts, and been settled accordingly. But, one-third ol the purchase money was paid in hand, and for the other two-thirds negotiable notes were given, (certainly by A. B. Rucker, and no doubt by the other purchasers also,) payable one and two years after date, according to the terms of sale; which notes appear to have been pune, tually paid at maturity; of course in Confederate States treasury notes. The money had greatly depreciated between the date and the maturity of the negotiable notes, no doubt greatly beyond the expectation of the pai’ties at the time of the sale. But, still the parties considered that the said notes were solvable in Confederate money at par, at the time of their maturity; and such payment was accordingly made by the purchasers, and received by the executor, in discharge of the said notes; and the property was thereupon duly conveyed to the purchasers thereof respectively. These acts of the purchasers and of the executor were done, and this settlement between them was made in perfectly good faith; and theyough not now to be undone or disturbed; whatever might *244 have been the rights of the parties after the war and under the adjustment acts, if the transaction had not been fully settled, as aforesaid, during the war. This settlement was made in accordance, it is believed, with the general understanding of the country in regard to the construction and operation of such contracts’; and similar settlements have no doubt been made, by fiduciaries and others, in a great many cases, which it would be productive of a great deal of evil, confusion and loss to unravel and set aside. It is far better to let such settlements, made during the war, remain as they were-made by the-parties, than to attempt now to do justice by setting them aside, and making new settlements for the parties. Courts have enough to do, in regard to these transactions, in settling such of them as remained unsettled at the end of the war. The preamble of the. adjustment act of March 3, 1866, affords some idea of the difficulty attending the adjustment of these unsettled matters. After reciting that a depreciated currency, known as Confederate States treasury notes, constituted the only or principal currency, in the greater part of this-State, during the late war, and that the result of said war involved the total destruction of said currency, the preamble proceeds to recite, that “whereas there are many contracts which were made, or obligations which were incurred, befóse the termination of said war, predicated . on said depreciated currency, still remaining wholly or partially unadjusted; in respect to which great uncertainty exists, perplexing alike to debtor or creditor, as to the present measure of their liabilities and rights respectively ; and it thus appearing useful that some uniform and equitable rule should be established for the adjustment of such mutual-demands and liabilities: Therefore,” &c: That it was the policy of this act not to disturb-settlements of these transactions actually, made between *245 the parties is shown by the proviso' of the 2d section, “ that in all cases where actual payment has been made of any sum of such Confederate States treasury notes, either in full or in part of the amount payable under sueh contract, the party by or for whom the same was paid, shall have full credit for the nominal amount so paid, and such payment shall not be reduced.” The 4th section of the act in regard to a tender, serves to show the view of the legislature as to the effect, not only of actual payment of a Confederate deot, but even of a tender of the amount-, on or after the maturity of the debt, and within the period prescribed by the act. We think, therefore, without enquiring what would be the most reasonable construction of such a contract, if the question ivere a new one, that wherever the parties have, during the war, bona fide settled the matter themselves, as in this case, by paying on the one side, and receiving ■on the other, the amount of a Confederate debt at its maturity, in Confederate States treasury notes, the transaction ought, forever, to stand and remain as thus settled.
The court is further of opinion that the payments made by the executor to the resident legatees, on account ■of their interest in the proceeds of the sale of the estate, were rightful and proper payments; that the executor •committed no breach of trust by retaining in his hands, as he did, the portions which belonged to the non-resident legatees, and in depositing the same in bank, under the order of the court, as he did; and incurred no liability in regard to the same, except for the depreciation ■of the money so deposited, between the time it ought to have been deposited under such order, and the time it was actually so deposited; with the amount of which depreciation he has been charged by the decree of the court below; and that the loss arising from the deprecia *246 ^011 ^e P01’tions retained by the executor and deposited in bankfor the non-resident parties as aforesaid, 0l1S^lt ^o on them alone, and not on all the legatees equally, including those residing in the State; and that proceeds of the sale of the Amherst bonds were-rightly decreed by the court below to belong to all the legatees equally, and not the non-resident parties exclusively.
It appears that the executor promptly and fully paid, to the resident parties their portions of the estate, and there is no complaint on their part against him in thatrespeet, although no account between him and them was-stated by the commissioner. Those parties residing here,, and being entitled to, and ready to receive, their portions, it was the duty of the executor to pay them. But the other parties residing out of the State, and cut off' by the war from all communication with the executor, it was out of Lis power to pay their portions, and he was compelled by necessity to retain them until the end of' the war. He retained them safely in his own hands until he made the deposit in ba,nk under the order of court, as-aforesaid. It does not appear that he was in any default in not having obtained the order for the deposit, at an earlier period. The order was made very soon after the second deferred instalment was paid. He-could not know how long it would be before the nonresident parties could receive their portions. He seems-to have acted in good faith in retaining the money in his own hands as long as he did. He says he was no-speculator, and it is not pretended that he derived any p'rcfit from the money, or used any part of it for his own benefit, although he is charged in his accounts with interest upon it while it remained in his hands The-estate of his testator was indebted to a large amount, which exhausted the greater part of the cash payment *247 for the real estate. The executor himself was a creditor of the estate, by bond and note, to the amount of upwards of $3,000, which was no, doubt, a special debt, and is charged to the estáte in the executorial account, as of the 14th of August 1862; being then paid in Confederate money. The executor having properly paid the portions of the resident parties, and set apart, and first retained and then deposited in bank, the portions of the non-resident parties, it follows that the loss arising from the depreciation or destruction by the effects of the war, of the money constituting those latter portions, must fall exclusively on the owners thereof, to wit, the non-resident parties; and all the rest of the estate having been divided equally among all the parties entitled thereto, it follows, as a matter of course, that they are all equally entitled to the only estate remaining foi distribution, to wit; the proceeds of the sale of the Amherst bonds.
The resident legatees had a right to receive their portions, and did accordingly receive them, leaving the portions of the non-resident legatees in the hands of the executor. That the latter legatees could not receive their portions, by reason of their non-residence and of the war which then- existed, was their misfortune, and is not attributable in the least degree to any fault of the resident legatees; who are,therefore not bound, upon any principle of law or equity, to bear any part of the loss arising from the depreciation of the money retained and set apart by the executor as the portions of the nonresident legatees. The money so retained and set apart was deposited in bank by the executor, in the names of the owners thereof, the non-resident legatees respectively, according to Ihe order of the court, and so remained on deposit until Confederate money perished by the result of the war. Of course, the loss must fall exciu *248 s^ve^ on ^e said owners of the money so deposited. If is said' the non-resident legatees never consented to rece*ve ^lose portions, which, therefore, were not theirs. Such consent was not necessary to make them theirs. The' resident legatees had of right received their portions, leaving the residue of the funds in the hands of the executor; and the case then stood as if that residue had constituted the whole estate and the non-resident legatees were the only distributees thereof.
The executor throughout the course of his management and administration of his testator’s estate,acted within the scope of his powers and, so far as the record shows, in perfectly good faith. It does not appear that he acted in any respect as a prudent man would not have acted, and did not often act during those extraordinary times, in regard to his own property; and these are considerations which have always had very great, if not con-1 rolling, effect in controversies in regard to the responsibility of fiduciaries in such eases. He acted with the advice and at the instance of all the resident parties, except, perhaps, one of them, who, however, did not object, was present at the sale, and received his portion of the money. And what is still more important to show the good faith with which the executor acted, he consulted able counsel and acted in pursuance of the advice and instructions of such counsel. The court perhaps, can not judicially know the moral character and pi’ofessional standing of any particular counsel; but the executor says that he retained as his counsel the late Chiswell Dabney, Esq., who had been the trusted friend and legal adviser of the testator, and that he strictly pursued the advice of said counsel in regard to all his transactions as executor. That counsel is spoken of in the record as having been distinguished for his carefulness, ability and uprightness, aud there is nothing in there- *249 cord tending to show the contrary. The record shows traces of the advice of good counsel in the management of the estate ; the executorial accounts having been regularly settled every year, and returned, confirmed and recorded. It would, at least, be a very hard case if, under all these circumstances, the executor should.be held personally responsible for the loss which has occurred. Certainly that loss is very great; and it has fallen, more or less, on all the parties concerned; though especially on the nonresident parties, by reason of the aeccident of their non-residence. But this loss has been the result, not of misconduct, but of misfortune, against which human foresight could not guard. Many of our wisest and best men lost their whole estates, after using every means which their wisdom suggested to avoid such a loss. Fiduciaries are fallible like other men, and can not be expected or required to take better care of the estates of others entrusted to their hands, than men of ordinary prudence take of their own estates. It is not strange therefore, that infants, and insane persons, and married women, and non-residents who owned property within the Confederate States during the war, sustained losses as other people did, and were involved in the same calamity which overwhelmed almost all who were in a like pre dicament.
Upon the whole, we think there is no error in the decrees appealed from, and that they ought to be affirmed.