# Richmond.

## JONES' ADM'R v. JONES' EX'OR.

### APRIL 24th, 1890.

EXECUTORS—*Liability*—*Case at bar.*—Where the will gave executor a wide discretion in dealing with testator's estate, and the condition thereof was such as fully justified his course, and he appropriated some of it to himself, but was "honest and faithful in all things": *held,* his conduct should be judged by the discretion given him, taken in connection with the condition of the estate, rather than by the strict rules of the law as to fiduciaries, and he should not be held accountable for losses which may have resulted from errors of judgment.

Appeal from decree of circuit court of Culpeper county, rendered December 23d, 1887, in the cause wherein the appellant, Charles Poindexter, administrator of his deceased wife, Mary F. Jones, was complainant, and John T. Jones, executor of Wm. R. Jones, deceased, and Samuel Rixey and others were defendants. Opinion states the case.

*Eppa Hunton, Jr.,* and *J. C. Gibson,* for the appellant.

*A. D. Payne, Rixey & Barbour, Hill & Jeffries,* and *G. D. Gray,* for the appellees.

LACY, J., delivered the opinion of the court.

This case is briefly stated as follows: In 1859, William R. Jones, of the county of Fauquier, who was the father of the appellant's decedent, Mary F. Jones, died, leaving surviving

him a widow and two children, the said Mary F. Jones and one William T. Jones, both of the said children being infants of tender years, one five and the other three years of age. He left a will by which he appointed his brother, John T. Jones, his executor; and, after directing the payment of his just debts, he left his estate to his two children aforesaid, requesting his widow, Alice P. Jones, not to claim dower, because she was possessed of sufficient estate in her own right, provided by her father, Samuel Rixey, with which request the said widow complied, and claimed no dower in the estate. The third clause of the will provided as follows: "3d. I appoint my brother, John T. Jones, the executor of this, my last will and testament, and the guardian of 'my infant children; and, having the most unbounded confidence in him, and in the interest which I am confident he will feel for my orphan children, *I do hereby empower* him to sell any part or all of my real and personal estate, or any part of either, as in his judgment may be most conducive for their future welfare, and to invest the proceeds in real or personal property, as to him may seem best and most secure." The will was dated February 14, 1859; and on the 25th of April, 1859, the said will was probated in the county court of Fauquier county, and the executor therein named qualified as such in that court on the same day. The estate consisted of one moiety of a tract of land, (the other half belonging to the father of the said widow,) which, however, had not been paid for, a quantity of personal property thereon, and a lot of slaves, a large number of which belonged to the said Rixey, father of the said widow, which the executor was not allowed to control or dispose of as such. The farm was kept up as a home for the widow and infant children, and cultivated by the executor for their benefit, until 1861, when the widow, on account of failing health, returned to her father's home in Culpeper, where she soon died. In February, 1862, the executor sold the personalty upon a credit of nine months. In December, 1862, the real estate, which was jointly owned

by William R. Jones' estate and Samuel Rixey, the father of Mrs. W. R. Jones, was sold, and, out of the proceeds, Samuel Rixey was paid his share, which was more than one-half, as he owned the buildings, and $8,524 74 to one B. F. Rixey, to whom William R. Jones was largely indebted for the land. The estate of William R. Jones was largely indebted to others; and these debts the executor paid off, in part, with the proceeds of the estate, and with money which he borrowed from certain parties for the purpose, in advance of the sale, to meet pressing demands from creditors, and to prevent a sacrifice of the property at forced sales by judgment creditors. Some of these refused to receive Confederate money in part, and others entirely, and the executor, finding $2,000 in his hands, made a temporary loan to one Tracy of this much, and sent the residue, $1,000 and $1,700, within the Confederate lines, to be invested or taken care of, and the $1,000 was invested in a Confederate bond, and the $1,700 put in bank; and shortly after the execu-·tor was captured by the Federal army, and sent to prison, where he remained as such until the war ended. Upon his return home, he settled his accounts *ex parte*, which were duly returned, approved, and recorded, in 1866.

Upon these accounts there was some litigation in the county court upon exceptions by Samuel Rixey, executor of Samuel Rixey, deceased; and in 1868 a suit appears to have been brought by Benjamin F. Rixey against him, having for its object the settlement of the estate of W. R. Jones, deceased. This bill, however, is not copied in the record. In this suit, Mary F. Jones appeared by petition, and sought to surcharge and falsify the *ex parte* accounts of John T. Jones as executor of William R. Jones, which was allowed. In the first account and report, that of August 6, 1866, the balance appearing due to the executor was, July 1, 1866, $10,272 16. Under the exceptions of Samuel Rixey, executor as aforesaid, in 1867, the account was corrected and some changes made, and in June, 1867, the balance due the executor was reported as $7,631 22;

the commissioner saying: "The account as now reported, includes the year ending May 1, 1867, and is supported by legal and sufficient vouchers; and the said account shows a balance due the said executor upon the said 1st of May, 1867, of $7,631 22,"—which account was examined by the court, approved, and confirmed, and ordered to be recorded, on the 24th of June, 1867. May 1, 1869, the account was again settled; and the balance reported in January, 1870, in favor of the executor, of $6,012 43, which was sustained, as stated by the commissioner, by satisfactory and legal vouchers, which was by a different commissioner, and in like manner confirmed and ordered to be recorded. This was again done in 1874 by still another commissioner, and the balance, as stated, sustained by legal and proper vouchers showing a balance due the executor of $5,644 35, all principal, which was duly returned, approved, and confirmed, and ordered to be recorded. In the chancery suit of *Rixey* v. *Jones*, referred to above, some of the papers in which are copied in this suit, Mary F. Jones, who had reached full age in 1875, on the 18th of September, 1878, filed her petition, referred to above, seeking to surcharge and falsify the settled accounts aforesaid of John T. Jones as executor of William R. Jones; and upon reference to the same commissioner who had stated the last balance of $5,644 35 in favor of John T. Jones as executor, a report was made and account stated wiping out this balance, and finding a balance against the executor in 1880 of $2,394 08, with interest from May 1, 1873, on $2,295 76. This was done by rejecting the $2,000 lent to Tracy, the $1,000 invested in a Confederate bond, and the $1,700 deposited in bank, and charging the executor with the amount of the personal property sold in February, 1862, and refusing him credit for that upon the ground that he had unduly delayed the sale until Confederate money was the only currency.

In January, 1883, the said Mary F. Jones brought her suit against the said executor, and for the first time bringing in his

securities on his executorial bond, and seeking to charge them
on his bond for the amount now proved due from him.    This
bill was consolidated with the pending suit of *Rixey* v. *Jones*
so far as to bring in the securities of John T. Jones on his
executorial bond, and the cause was brought on upon the fore-
going and a subsequent report of the same commissioner, made
in the foregoing cause, on the 19th of September, 1885, this
decree being entered on the last-named date, when it was
ordered that it be recommitted to one of the court's commis-
sioners to be reformed as might seem proper, and for report as
to whether there was any error in these stated accounts to the
prejudice of his said sureties on his executorial bond.    March
15, 1886, this report came in, when the commissioner adhered
to his former charges against the executor, but, in the alterna-
tive, reported that, if the court should consider the $1,000 and
the $1,700 above referred to the property of the estate of W.
R. Jones, then the said commissioner was of opinion that the
said executor, having these sums in his hands as executor, had
used all the ordinary care that the law required of him in the
care of them, and should not be charged with them, but, as to
the $2,000 lent to Tracy, he should be charged with that sum.
In December, 1887, the court, upon this report and the excep-
tions thereto, rendered the decree complained of, when the
court was of opinion that the sureties should not be held respon-
sible for the $1,000 invested by the executor in the Confederate
bond and for the $1,700 deposited in the Lynchburg bank, and
it being manifest that, upon a correction of the accounts of the
executor in these particulars, there would be nothing due by
the said executor for which the said securities are responsible,
it dismissed the causes as to the said sureties, but declined to
reopen the accounts as to the said executor.    From this decree
the executor does not appeal, and we are not, therefore, called
on to consider any error as to him.    But, the said Mary F.
Jones having married the appellant, and having died, and he
having qualified as her administrator, and having been made

heretofore a party to the cause, he has appealed from this
decree enoxerating the said sureties from liability for the said
sums.

In this the decree was plainly right : (1) There can be no
question but that these sums were realized from the sales of the
personal property of W. R. Jones. (2) The will in this case
gave to the executor a wide discretion as to his dealing with
this property, by which his conduct, taken in connection with
the condition of the estate, should be judged, rather than by
the general provisions of the law as to fiduciaries. (3) The
condition of the estate was such as to fully justify his course.
This was : (a) The land held by the widow's father and the
estate had not been paid for. To sell it would be to deprive
the widow and children of their home, from which there would
be no proceeds to procure another home. (b) There were
many debts against the estate, which, if paid by an immediate
sale, would have left the estate nothing from the proceeds of
the personalty. It was the knowledge of this state of things
which caused, no doubt, the insertion of the said third clause
of the will. Whereas, by using the whole land, instead of
selling one-half of it, which was all this executor could have
sold, and keeping all the personalty together, rather than sell-
ing a part of it (for as to this, also, a large part of it belonged
to Rixey), the executor was able to support the family as long
as the widow lived and pay off the debts by borrowing addi-
tional sums, which have proved a loss to him.

This executor is not amenable to censure. It is evident from
this record that he was honest and faithful in all things. He
has appropriated none of the estate to himself. There is no
claim that he has made any false charges against the estate.
Upon the face of the transactions, he was largely a creditor ;
and this balance so due him he conveyed to a trustee for the
benefit of the parties who had lent him the money by which,
in part, he had become a creditor of the estate. It is evident
that his brother's large confidence was not misplaced in him,

in any degree; and these sweeping changes on the face of the transactions, setting him aside as a creditor for a large sum and bringing him in as a large debtor, were not made by falsifying his charges or bringing home to him concealed sums received and not accounted for, but by applying to him the strictest rules of law at a time when the shifting scenes being enacted around him, and overturning all things and upsetting all values, rendered him, however prudent or capable under an ordinary state of things, a victim, in this case, of circumstances over which he could exercise no control. He was no more able to preserve his brother's property from destruction than he was to free himself from the prison within whose walls he was confined. And, if it is urged that he should have sold off and settled up before the war burst upon the country, the answer is (1) that the will of his brother gave him a discretion which he discreetly exercised according to his surroundings at the time; and (2) that he had no foreknowledge of the coming events which were destined so soon to convulse the country, and, if they surprised him in the unsuspecting pursuit of his daily business, he in this but shared the common fate. His good faith is not questioned. He did what a prudent man would naturally do under like circumstances, and he is not justly liable for loss which was not caused by any fault of his, and which, by ordinary foresight, he could not have prevented. This is the result of all the decisions in this court. If an executor has been faithful and honest, and reasonably diligent, he is not required to be infallible, and is not held responsible for losses caused by mere errors of judgment, where these exist, which cannot be said of this executor's acts. The events and the results attested his prudence. The amount and value of the estate was apparent only. The 200 acres of land, without buildings, were but little more than adequate to satisfy the unpaid purchase money due thereon. And the result showed that the father did not hold the other half for his daughter, as the testator supposed, but for himself, which he duly so appro-

priated. The executor was not allowed to avail himself of the slaves held by the father for his daughter, as the supposition was, by sale, although he was allowed to use them; and that this would be so, it is reasonable to suppose, the executor had knowledge. If he had made prompt sale of all the property of the estate, he would have saved himself from loss, but in no wise benefited the estate; indeed, quite the contrary.

In the case of *Cooper* v. *Cooper*, 77 Va., 203, Judge Fauntleroy, speaking for this court, said: " It will thus be seen that the will of the testator, Joseph H. Cooper, gave to his executor full discretion to determine the time when it would be advisable to sell the real estate and stock of the testator. * * * If the executor honestly exercised the discretion conferred upon him by the will, then, by the principles settled by this court in the cases of *Mills* v. *Mills* and *Mills* v. *Lancaster*, 28 Gratt., 442; *Lingle* v. *Cook*, 32 Gratt., 262; *Staples* v. *Staples*, 24 Gratt., 225, he cannot be held liable for any loss which may have been occasioned by an honest error of judgment. The honesty and good faith of the executor, J. B. Stevens, are not questioned by the appellants." See, also, *Green* v. *Thompson*, 84 Va., 376, and cases cited; *Myers* v. *Zetelle*, 21 Gratt., 753; *Staples* v. *Staples*, 24 Gratt., 225; *Mills* v. *Mills*, 28 Gratt., 476; *Thomson* v. *Brooke*, 76 Va., 160; *Parsley* v. *Martin*, 77 Va., 381; *Davis* v. *Harman*, 21 Gratt., 194; and *Pidgeon* v. *Williams, Id.*, 251. We are of opinion that there is no error in the decree appealed from of which the appellant can complain, and the same will be affirmed.

DECREE AFFIRMED.