Moncure, P.
This case has been three times argued before this court, and each time at great length and with great ability. I was a member of the court, and heard the argument on each of the three occasions; and if I am not now able to decide the case correctly, it is certainly not because it has not been sufficiently argued before me. My opinion in it is as follows:
The controversy in the case is concerning the effect of certain acts done by Dr. Charles S. Mills and Mr. B. B. Howison, as executors of Nicholas Mills, deceased, of which some of the residuary legatees of said testator complain as breaches of trust; and they claim to hold the said executors and certain other persons charged to have been participants in the said breaches of trust liable for the losses thereby occasioned. Those acts consisted of the said executors’ receiving, during the war and as late as 1863, Confederate money at par in payment of debts due to their testator in good money and well secured by liens on real estate, and in investing the amount so received in Confederate bonds on account of said testator; and the persons charged to have been participants as aforesaid were the debtors by whom the said payments were made. The said *449 debts consisted of a debt of one thousand dollars, due by Thomas Bradford, payable January 1st, 1863, and paid by him to the said executors on the 3rd of month; also of a debt of ten thousand dollars, due by the Exchange hotel company, and paid on the same day, out of the proceeds of the sale of the property of that company, sold at or about the same time; also of nineteen thousand dollars, par value of one hundred and ninety shares of the stock of said company owned by the testator, which said sum of money was paid to the said executors out of the proceeds of said sale; also of a debt of nine thousand two hundred and sixty-eight dollars and eighty-eight cents, paid by Charles Y. Morris to the said executor on the 12th day of March 1863, being the principal and interest of a bond due by him to the testator; also of a debt of one thousand three hundred and sixty dollars, due by note L. W. G-lazebrook, and paid to said executors on the 12th of March 1863; and of a debt of one thousand three hundred and thirty dollars, due by note of same debtor, and paid to said executors on the 19th of April 1864; also of twenty-six thousand six hundred and sixty-six dollars and sixty-séven cents, paid to the said executors on the 29th of April 1863 by Lancaster and other purchasers of the Exchange hotel property, to extinguish ground rent reserved on a lease from said testator to the said hotel company; also of one thousand five hundred dollars, paid to the said executors on the 1st of September 1863, on stock of the testator in the.Midlothian coal mining company. Besides these matters, others were embraced in the controversy in its commencement and progress, which seem to have been since abandoned; and therefore little or nothing will be said of them in this opinion, except to name them. They are: 1st, the Leigh street property, *450 which was sold by the said executors on the 28th of October 1862, just two and a half months after the death of the testator, for the enormous sum of one hundred and twenty-eight thousand two hundred and thirty-six dollars and thirty cents—more than double the amount at which it had just before, in the same month, been appraised. Everybody who heard of the sale was no doubt astonished at the amount it produced, which was more than enough to buy as much gold, dear as it then was, as the property would have produced before the war. And everybody who was interested in the sale seemed to be well pleased with' it, with the exception, perhaps, of Mrs. Robinson, a daughter of the testator, who lived on the property at his death, and had, therefore, to look out for another home after the sale. And complaint was made in the argument that the sale was made in such haste, that almost before the funeral bell of the testator ceased to be heard, the bell of the auctioneer was ringing to give notice of the sale. A plain answer to this (if any be necessary) is, that the testator made ample provision for his said daughter, which did not include her continued residence on his Leigh street property, which constituted the greater and by far the most valuable part of his real estate, but was producing little or no rent at his death, and was not capable of producing much, in comparison with the great value of the property. The testator, by' his will, expressly desired that his executors should sell all his real estate not otherwise specially disposed of, jn such manner and on such terms as they might deem most advantageous; and it was obviously their duty to sell the Leigh street property as soon as it could possibly be done consistently with giving of due notice of the sale. It could only be sold for Confederate money; and,the *451 whole purchase money, large as was the amount, was paid in cash, and the greater part of it was soon invested in eight per cent. Confederate bonds. After the war was over, and after this controversy was commenced, the objection seems for the first time to have been made, that the sale and conveyance of this property were invalid, because only two of the three executors nominated in the will joined in making them. But they were made by the only nominated executors who had then qualified, and who had endeavored in vain to procure a furlough for the other nominee, 'Thomas Y. Robinson, who was in the army at the time of the testator’s death, and continued there during the war, to enable him to return home for the purpose of qualifying also. It would not be difficult to show that this "objection is not well founded in law. But it is now unnecessary to do so, for reasons before stated. Secondly, fifteen thousand three hundred dollars, the amount of the bonds of the Midlothian coal mining company to the testator, were paid by that •company to the said executors on the 18th of November 1862. There is now no complaint as to any payment made to the executors before 1863; though there would seem to be no difficulty in showing the propriety of receiving this payment; but it is unnecessary to do so.
I will now proceed to consider the controversy still remaining in the case in regard to the liability of the said executors on account of Confederate money received by them .after the 1st of January 1863, in payment of debts due their testator, and invested in Confederate bonds as aforesaid.
That liability depends upon two questions, viz: 1st. Whether the executors had power to perform the acts complained of; and 2ndly, Whether, in perform *452 ing them, they acted in good faith, and in discharge-of what they believed to be their duty as executors ?’ If these questions can be answered in the affirmative,, then no such liability exists, and of course, in that case, there is no liability, on account of those acts, on the part of any of those who paid the money to the-executors.
First, Had the executors power to perform the acts, complained of? To receive the Confederate money paid to them, and invest the same in Confederate-bonds as aforesaid—supposing the acts to have-been done in good faith on their part and in discharge of' what they believed to be their duty as executors ?
We have only to read the will of Nicholas Mills to-be able to answer this question, with great confidence,, in the affirmative. And our conviction to that effect will become still stronger, if possible, when we do what a court of construction must always do; that is, place ourselves precisely in the situation of the testator when he wrote his will, look at all the circumstances which then surrounded him, and read and construe his will in the light of those circumstances. He was an old citizen of Eichmond, where he died- and probably had always lived; was very wealthy, owning at the time of his death, besides real estate and slaves of great value, stocks and debts due him, of' large amount, and other property; his whole estate-being valued at upwards of $400,000. He was an intelligent gentleman, of business capacity, and retained his faculties unimpaired to the time of his death. He seems to have had no immediate family living with him when he made his will, or afterwards, except, perhaps, his widowed daughter, Mrs. Eobinson, and two of her children, who were both grown up. But he had a large number of children and grandchildren,. *453 who, or most of whom, needed his assistance at the time he made his will, and of his death; though he had provided largely for his children by advancements previously made to them. These children and grandchildren were the main, and almost the only, objects ■of his bounty in his will; and he was obviously anxious to dispose of his estate in such a way as to do them the most good, and afford them the speedy and •regular relief which they needed; some of them being feme coverts, others unsuccessful managers apparently, ■and 'most of the grandchildren (all of them but three) infants. In this state of things, it was all important ■that he should select the most trustworthy persons to be his executors, especially if he devolved on them the many and various trusts made necessary by the state of his family and property, and of the extraordinary times which then existed. It was also important that he should invest these executors and trustees with the amplest power and discretion in the execution •of his will. He made his will on the 17th of October, 1861, six months after the war had commenced, and when it had become flagrant. He lived nearly twelve months after the date of his will, and until the 12th of September, 1862, when he died. "We were .then in the midst of the war, and Confederate money had become the only currency; for which only could property be sold; and in which only could debts be •collected. The testator continued to manage his own •affairs after the date of his will, and until his death, and during that period he collected in Confederate money large amounts of debts due him in good money, including some which were well secured by liens on real estate, and he invested the money collected, or most of it, in eight per cent. Confederate bonds. Some of these collections were made a short *454 time before his death. After he made his will, he-never added a word to it, or took a word from it, or any change in it, but left it at his death exactly ag wag w]ien wag £rst written. A testator’s will mus^ considered as speaking at the time of his death, unless a contrary intention be expressed or-plainly implied therein. At the date of the will, and at the time of the testator’s death, it was the general if not the universal belief in the Confederate States that their cause would be ultimately successful, and that in that event all Confederate bonds would be fully paid, and it was then generally believed that the war would terminate much sooner than it did. Such belief continued to prevail during the year 1863, and until the last payment complained of in this case was, made, though it no doubt grew weaker and weaker in some degree as time progressed, and as Confederate money continued to depreciate. While such depreciation became comparatively great in regard to gold, which ceased to be currency, and was an article of merchandise of peculiar value, it was not near so great in regard to other articles, and it was hoped and expected that it would soon undergo a great change, and be as valuable, or nearly so, as it was when it was first-issued. It is difficult for us now to recall the views we entertained of these matters during the early period of the war; but it is necessary to do so as far as possible, in order to estimate correctly the import of transactions occuring during that period. If we judge them by the present lights, we will universally condemn them, though we generally approved them when they occurred.
Let us now look at the will, and see what powers if conferred on the executors, and whether they are broad enough to cover the acts in question. It confers the- *455 most extraordinary powers and trusts upon the exeeutors. It contains twenty-two clauses, almost every one of which confers such powers and trusts. The second clause creates a trust in favor of George Mills, a son of the testator, to whom is given an annuity of $800, payable quarterly in advance during his life, to be applied to and for his personal support, &c., and to “be free from any contract made by him, unless such contract be for his necessary and proper support. Of all which matters I constitute my executors the exclusive and absolute judges.” The fourth clause creates a trust in favor of Mrs. Robinson, commencing thus: “I give, devise, and bequeath unto my executors, hereinafter named, in trust for the separate benefit of my daughter, Sarah Ann Robinson, and her children and grandchildren, born or to- be born, subject to the purposes, limitations and conditions hereinafter declared, the sum of,” &c.; and then proceeding to set forth the long details of the trust. The fifth clause creates a similar trust to the same trustees, in favor of the same beneficiaries, in regard to certain slaves. -But without setting forth in detail the many trusts created by the will, in which the executors are made trustees for the benefit of different members of the testator’s family and their descendants, it may be sufficient to say, in general terms, that besides the clauses before enumerated, the sixth, eighth, ninth, tenth, eleventh, twelfth, thirteenth, fourteenth, fifteenth, eighteenth and twentieth clauses create important trusts in favor of different objects of the testator’s bounty, in all of which the executors are named as the trustees, to carry the said trusts into effect. The fourteenth is the most important clause of the will, especially in regard to this controversy, and will be set forth in full. It is in these words:
*456 “ 14. All the real estate which I may leave at my death, not otherwise specially disposed of, I desire that my executors shall sell in such manner and on such terms ag ^6y may ¿eem most advantageous. All mo-11 ef on hand, and stocks in companies, not specifically given or bequeathed in this will, all debts due me, and all other personal estate owned by me, I hereby direct executors, as soon after their qualification as practicable, to dispose of as follows: My slaves shall be disposed of as provided in the next clause of my will. All other funds shall be applied first to the payment of my funeral expenses, medical bills, all just debts I'may owe at my death, and then to the satisfaction of the two sums of one thousand dollars each given to my daughters, Sarah Ann Robinson and Jane R. Blair; then to provide for the punctual payment of the annuities hereby given; then for the pecuniary legacies hereby given to my children; then for the pecuniary legacies hereby given to my grandchildren. All the rest and residue of my estate (except slaves), not specifically devised or bequeathed herein, no matter of what it may consist, or where it may be, not effectually disposed of by this will, or which may turn out by lapse of devisees, legatees or legacies, not to be effectually disposed of by my will, I hereby bequeath as follows: first, out of such residuary fund shall be paid to my sons, Charles S. Mills and Ronald Mills, each $3,000, and the remainder I give and bequeath equally, share and share alike, to all my grandchildren, and the lineal descendants of such as may die, such descendants taking the share of the parent; but my six grandchildren, to whom $2,000 each are bequeathed, are not to participate without bringing into the division the said .legacies of $2,000 each so given to them.”
*457 The twenty-first elause of the will is in these words: ■“I appoint my son, Charles S. Mills, my grandson, Thomas Yerney Robinson, and Robert R. Howison, -executors of this my will, and having confidence in their capacity and integrity, I direct that security shall not be required of them on their qualifying as such.”
The intention of the testator obviously was, that his estate should be divided and disposed of by his exeeutors, according to the directions of his will, with as little delay as possible consistently with the apparent interest -of his devisees and legatees; and for that purpose, that nil his estate, real and personal, not specifically devised -or bequeathed, except his slaves, and the debts due him and perhaps his stocks, should be sold; and that •all the debts due him should be collected by his executors, and the proceeds of such sale and collection •applied to the payment of the pecuniary legacies, and the surplus divided among the residuary legatees, and •such investments made as are directed by the.will. He probably did not expect that any of the stocks on hand, which were susceptible of easy division among the residuary legatees, would be sold by his executors, but rather that they would be divided in kind. Though “having confidence in their capacity and integrity,” he no doubt intended that they should exercise their discretion in selling or not selling any of his •stocks not specifically bequeathed by his will. He had no difficulty in regard to the currency, present or prospective; at least not enough to produce any change in his will. He knew, of course, that the currency had depreciated, and was depreciating; but he no doubt hoped and believed, as we all then did, that it would come out right in the end, and perhaps •sooner than we expected. At all events he knew that •nearly all, if not all of his devisees and legatees were *458 need of the means of subsistence, and were dependent for them entirely on what they were to derive from him under his will. It was absolutely necessary therefore that they should have money. The only money then current was Confederate money, and they could only obtain that in any sufficient quantity by the-sale of property and collection of debts belonging to-estate. He empowered them to make-such sale and collection, and expressly desired them to sell all his real estate, not otherwise specially disposed of, in such manner and on such terms as they might' deem most advantageous.
Assuming the executors to have acted bona fide in-doing what they did (a question we will presently consider), I think I have said enough to show, and hope I have fully shown, that they had ample power to do so; unless there be something in one of the-grounds taken to show that they had not power to-receive the money paid to them by Lancaster and others in extinguishment of the ground rent on the-Exchange hotel property. That ground is, that tho deed to Lancaster and others for the reversion to-which that ground rent was incident was executed only by the executors Mills and Howison, and not also-by the executor Robinson; and therefore the deed was void, and the title to the reversion still remains in the-heirs of Nicholas Mills, or as part of his estate, and would so remain even if the payment had been made in gold instead of Confederate money. I will, therefore, consider that question at this point, as it is a question of power in regard to this part of the transaction.
Beyond all question, the reversion to which the said rent was incident was, before the said rent was extinguished as aforesaid (if it was so extinguished), real *459 estate of Nicholas Mills, and might have been sold by his executors under his will, just as his Leigh street property was sold; and the purchaser would thereby have acquired, with the reversion as incident thereto, the right to the annual rent from the time of the sale. ° _ It might, and no doubt would have been contended in that case, that the executor Robinson, having qualified before that sale, would have been a necessary party to the deed to the purchaser. A sufficient answer to such an objection no doubt would have been, that the deed having been executed, and the purchase money received by the two acting executors, and the other executor not having objected to such acts of his eoexeutors, but, on the contrary, received one-third of the executors’ commission on the amount of the purchase money, he thus confirmed what had been done by his associates and gave it the same effect in a court of equity which it would have had at law if all the executors had joined in the original transaction.
But it is unnecessary in this case to consider that question, as there was no such sale of the reversion with the rent as incident thereto. Instead of that, Lancaster and others, purchasers and assignees of the leasehold estate in the Exchange hotel property, subject to the payment of the rent reserved in the lease, and with the right thereby secured to the lessees or their assigns to extinguish the rent by the payment of a sum of money in gross sufficient to produce an amount of annual interest equal to the annual rent, under the lease, elected to extinguish the rent, and accordingly tendered to the executors, Mills and Howison, $26,666.66|- cents, in current money of the Confederate States, being a sum sufficient to produce, in . interest thereon at the rate of six per centum, the sum. of $1,600, the said annual rent; and desired a deed *460 demising ttie property in fee simple and releasing the rent and rent charge aforesaid. And accordingly the said executors received the said amount so tendered, an(^ exeeute(j sach a deed. And the executors invested money so received in Confederate eight per cent bonds, for the benefit of the legatees of their testator, Ho objection was ever made to this transaction by the third executor, or any of the other parties concerned, until after the war; but, on the contrary, that executor in effect confirmed it by receiving one-third of the commission on the amount charged by the executors in their account, which was made out in the name of all three of the executors and returned, confirmed and recorded. So that the transaction stands on the same footing, in a court of equity, at least, as if all the executors had concurred in it from the beginning.
But there is another view of this branch of the subject which seems to be conclusive of it. The effect of the will was to break the descent and devolve the title to the land upon the executors, instead of the heirs of the testator. The executors bad not a mere naked power of sale, but a power coupled with an interest, and most important trusts. The estate did not devolve on the heirs for an instant, either at law or in equity, but enured at once to the executors for the purposes of the will. Mosby’s adm’r v. Mosby’s adm’r, 9 Gratt. 584. When, therefore, Lancaster and others elected to extinguish the rent by the payment of a gross sum, according to the terms of the lease, that gross sum became the property of the estate of Mr. Mills, and payable to his executors like any other debt due to his estate, and might have been received by any one or more of them. If it be said that all of the executors must join in the deed of release of the reversion, without admitting the necessity for any such joinder, it is *461 a sufficient answer to the objection to say that it would nqt follow from such admission that all of the executors must join in receiving the money. It is like case of an executory contract for the sale of real estate where the vendor dies before the money is paid or the estate conveyed. There the title to the purchase money is in the executors, while the title to the estate is in the heirs of the vendor. Either, any, or all of the executors may receive the money, but all the heirs must convey the title. When the money is paid, a court of equity will, of course, if necessary, enforce a proper conveyance of the legal title. In this case the legal title was in the executors, instead of the heirs, by reason of the descent being broken. But, if the same principle applies, and all the executors must join in conveying the title, that does not make it necessary that all should join in receiving the purchase money.
I think, therefore, that the payment of this sum of $26,666.66|- cents to the executors stands on the same footing with the payment of any other debt due to the estate in good money and about the same time paid to the executors in Confederate money; and that the executors had power under the will to receive such payment as well as payment of any other debt as. aforesaid; provided that, in so doing, they acted in good faith. And now I proceed to consider the other question on which the alleged liability of the executors-depends, viz:
Secondly, Bid the executors, in performing the acts, complained of in this case, act in good faith and in discharge of what they believed to be their duty as-executors?
It was their sworn duty so to act, as well as the condition of their official bond; and they say in their *462 answers an(^ testify in their evidence that they did so act; and they so account for their conduct in regard to each of their executorial transactions complained of ^ case> as plainly to show, if their account be true that such conduct has been blameless, however unfortunate, or even unwise, it may in some respects have been. The presumption is always against the existence of fraud, and strong evidence is required to prove it; and testimony tending to show that no such fraud exists can be countervailed only by a decided preponderance of evidence on the other side. There is no charge of fraud contained in any of the bills against the executors. They were not speculators, and made no use, on their own account or for their own benefit, of any of the money received by them as executors, except the comparatively small portion of it to which they were entitled as their commission. They applied the money so received, as soon thereafter as could well be done, to the payment of legacies as far as that could be done, and invested the surplus in eight per cent. Confederate bonds, so as to make it as productive as possible, and as speedily as possible for the residuary legatees,'most of whom were in great need. S'either of them had any motive, and certainly not anything like an adequate motive, to do wrong in the execution of his duties as executor. The only motive of that kind which seems to have been attributed to them in all these proceedings is, that they were interested in getting the largest possible amount •of commission on their receipts, and were therefore interested in making their receipts as large as possible. A commission of five per cent., in Confederate money, •on the amount received by the executors, is a matter of small value, taken altogether; but, divided among three (as it was), or even two executors, is very insig *463 nificant—far too much so to warrant suspicion, much less to amount to proof of fraud on the part of the executors, who were gentlemen of high character for integrity as well as capacity, in whom the testator reposed the greatest confidence, as is plainly shown by his whole will. One of the executors is a son and legatee of the testator, as also are his children residuary legatees; and it is obvious that he and they would lose much more by the acts of the executors which are complained of, supposing them to result as they did, than he could possibly gain by his share of the commission. He was also an uncle of the other residuary legatees, and naturally desired to benefit them as well •as his own children and himself. As to this executor, therefore, the decided preponderance of motive was the other way.
But it is said that as Confederate money after the first of January 1863 was greatly depreciated in value as compared with gold, and continued more and more to depreciate until it came to be of no value, the executors committed a devastavit in receiving in that currency after that day payment of debts due to their testator in good money, and are therefore liable without regard to their motive.
Though Confederate money at the date aforesaid had •depreciated in value as compared with gold, it had depreciated very little, if at all, in regard to most other subjects. Gold had ceased to be currency, and for pe- . culiar reasons had become an article of merchandise of extraordinary value during the war. It is necessary therefore in ascertaining its real value at any time ■during that period to compare it with other articles than gold, and especially with articles of prime necessity. Accordingly this court, in January 1869, when the controversy involved in this case was first before *464 declined making a decree upon the merits of the controversy in the existing state of the record, but remanded the cause to the court below, with directions n .. . , . . , . , , tor “ an enquiry by a commissioner to ascertain what was’ on ^th day of April 1863, the value as compared with specie of the treasury notes of the United States, and also of the treasury notes of the Confedera^e States, and to what extent at that time the treasury notes of the Confederate States were, according to the common usages of business in Bichmond, available for the payment of debts contracted before the war, and payable in specie or in current money of the United States, and well secured on real estate, or for the purchase of property or otherwise, with leave to any of the parties to file additional evidence as they might be advised upon any matter involved in the cause.” Accordingly after the case went back to the court below, such an inquiry was made by commissioner Hudnall, and such additional evidence was taken before him, and he made his report thereon, from which it appeared that, on the 30th of April 1863, the value of the treasury notes of the United States, as compared with specie, was as one-and-a-hal'f to one, and the value of Confederate States treasury notes, measured by the same standard, was as five-and-a-half to one. In answer to the next enquiry, as “to what extent at that time the treasury notes of the Confederate States were, according to the common usage of business in. Bichmond, available in payment of debts contracted before the war, and payable in specie or in current money of the United States, and well secured on real estate, or for the purchase of property or otherwise,” the commissioner reported a considerable conflict of evidence, all of the witnesses perhaps agreeing that to some extent, and by some persons, such *465 notes were received at par at that time in payment of such debts, but differing as to such extent, and the comparative number of such persons—some of the witnesses testifying that the practice was general, and others testifying that it was only exceptional. Among the former were Wellington Goddin and Lawson ISTunnally. Wellington Goddin was a real estate auctioneer for many years in Richmond, and during a portion of the war a banker and broker in Richmond. He “testified that Confederate treasury notes were generally accepted in payment of debts due, whether contracted before the war or not; that many citizens who had debts due them, secured by trust deeds, were willing to accept payment at par in Confederate notes. A few persons in this city at that time refused to accept Confederate notes in payment of debts contracted before the war, but that the number of such persons was so small as to form only an exception to the general number. That the general usage of business was to receive Confederate notes in payment of old debts. United States notes were not in circulation. They were worth two to three for one over Confederate notes.” Lawson Hunnally testified that he “resided in Richmond since 1840; before and during the war was president of the Bank of the Commonwealth in this city; as soon as the Confederate government could prepare a sufficent amount of treasury notes they became almost exclusively the circulation of the state; as early as 22d March 1862 the Virginia legislature passed an act making these notes receivable for all public dues to this state; after this they were used in all current transactions, and as bankable currency in this city, none other being in use except Virginia treasury notes, and they only to a limited extent. His recollection is, that debts contracted before the *466 war were generally settled in Confederate notes,” &e. The commissioner, after stating a summary of the testimony on both sides of the question, makes this rep0rtnp0n jt. «J think therefore that I am justified *n rePor*;ing that on the 30th April 1863 Confederate notes were available to the extent of their face value in payment of debts contracted before the war, and Payahle in specie or in current money of the- United States, and well secured on real estate among merchants and banks and those persons whose necessities, prompted them to receive such payments, but outside of these classes of persons, although it might have been occasional, it was not common usage for these notes to be available for the payment of such debts.” The executors excepted to the conclusions of the commissioner in his report as unwarranted by the evidence.
Uow, if we are to judge of the conduct of the executors on the testimony of Goddin and Uunnally, there can be no doubt that they are not liable; for they did not more than conform to the general usage in receiving the debts in question in Confederate money. And why are we not to judge of that conduct by that testimony ? Who in Eichmond would have been more likely or reasonably enquired of on the subject than these two witnesses ? Who had better opportunity of knowing the facts than they? Who could have been more safely relied on? Suppose the executors had enquired of those gentlemen on the subject, and concurring in their view, had acted accordingly, and in good faith, and in discharge of what they believed to be their duty as executors, could they have been made liable for the unexpected result of their act, even though others may have differed with them as to the wisdom of the act ? Certainly not.
*467 But suppose we judge of their conduct on all the testimony set forth in the commissioner’s report, and -on his own conclusion upon it, can we hold them liable, supposing them to have acted in good faith, as we are bound to presume they did, in the absence of any evidence to the contrary, and as no doubt they did—I -again say, certainly not. Bor in that view, they only did what all merchants and banks and some other persons in Bichmond would have done.
In all these cases in which Confederate money was received in payment of ante war debts, whether by merchants, banks, or those executors, I take it for granted that the receivers confidently believed that Confederate money, or the Confederate bonds in which it might be invested, would ultimately be fully redeemed and satisfied. They had confidence, as all true Confederates then had, in the ultimate triumph of our cause, and payment of our debt.
To be sure, if a person to whom a well secured debt was due had no occasion for the use of the money, he would not be apt to receive it voluntarily in a depreciated currency at par, but would" prefer to let it stand until he could obtain' payment in money that was not depreciated. If, however, he had occasion for money, and there was no other in circulation but depreciated money, he would have to receive that or none.
I have thus far been considering this case without reference to the peculiar circumstances in it tending to increase the propriety, if not necessity, of receiving, payment of the debts in question in Confederate money. These circumstances are as follows:
1st. The executors were acting in execution of the will of a testator, who died on the 12th of September, 1862, in the midst of the war, when Confederate money was the only currency, had greatly depreciated *468 in comparison with the value of gold, and was stilt depreciating, who, by his will, gave his large estate to-a large number of children and grandchildren, most, of whom appear at the time of his death to have been in need of the means of subsistence, and dependent, therefor on their interests in his estate. He therefore-plainly intended, and expressly or by plain implication. directed by his will, that his estate should be distributed and disposed of in pursuance of the same as soon as possible; and for that purpose, that the whole estate not specifically devised and bequeathed, except his-slaves, should be converted into money by sale of property, real and personal, and collection of debts, so far as might be necessary. His real estate, not specifically devised, consisting mainly of his valuable Leigh street property, not being susceptible of division-among his devisees, he expressly directed to be sold;, and therefore that property was sold by his executors,. Mills and Howison, as soon as could properly be done,, and in less than two months after his death. His stocks and railroad bonds, not speeifically disposed of by his will, were, or seemed to be, susceptible of division in kind among his legatees, and therefore none of' them were sold by his executors. The debts paid to the executors, the receipt of which by them in Confederate money is complained of in this case, could not it seems be divided in kind among the legatees; and therefore their collection by the executor was necessary, and was required by the will. The executors therefore acted in obedience to the will of their testator in making the collections complained of. It was necessary to make them for the purposes of the will,, and they could only be made in Confederate money,, which was then the only currency. The testator well knew that fact, and that the currency was depreciated,. *469 and continuing to depreciate; and yet he directed his property to be sold, and the debts due him to be collected immediately, instead of being postponed until a ■change might take place in the value of the currency, which he could and would have directed in his will if he had so desired. To further show, if possible, that he really intended what he expressly said in his will, he proceeded after the date of his will, and before his death, to execute it in part by receiving Confederate money in payment of well secured good money debts, and in effect telling his executors, or one of them, his son, that such was his will. The executors collected no debt of which payment was not tendered to them by the debtor. How could they have declined to receive such payment under the circumstances? If there had been any very material depreciation of the currency between the death of the testator and the time of such payment, it might have been questionable whether it was not the duty of the executors, notwithstanding the direction of the will, not to receive such payment, upon the presumption that the testator in making his will did not anticipate or contemplate so great an increase of depreciation. But the executors might well have ©onsidered that there was no such increase of depreciation when such payments were made as to warrant them in refusing to receive such payments; and if they erred in their judgment in that respect without any mala fides, it was a mere error of judgment, which certainly would not make them liable. Another of the peculiar circumstances aforesaid is,
2nd. The legislation, present and prospective, of the state and of the Confederate States, before, at and about the time of said payment, was such as to make it probable that the refusal of the executors to receive such payments would subject the estate of their testa *470 tor to heavy loss by increased taxation, and his legatees, or some of them, to great inconvenience by a. material reduction of their income. These acts of' legislation aré referred to in the record and in the briefs of counsel, and need not be noticed in detail here, as they may be seen by reference to the acts themselves. In regard to the Morris bonds, Dr. Mills-in his deposition says: “ Sometime during the year 1862, the period I cannot exactly recall, but not long-before my father’s death, Mr. Charles T. Morris met me and informed, me that he was prepared to pay $9,000, the amount of the first bond alluded to. I at that time was acting as the agent for my father for the collection of his rents and interest, and Mr. Morris supposing that I was authorized to receive the money,, proposed to pay it to me in Confederate notes. I refused to receive it, and remonstrated with him as to-paying it in that currency. He claimed his right to-pay it, and I then told him I had no right to receive it, but referred him to my father who had the bond and could alone give him a receipt for the payment. That evening I saw my father, who told me that Mr. Morris had. mentioned to him the conversation that had passed between Mr. Morris and myself, and that he (my father) had allowed him to discharge the bond in Confederate money; and he expressed surprise at my unwillingness to receive Confederate notes, and said that he would not only receive them, but that it was the duty of every good citizen to do the same., "With regard to the second bond, sometime during the-year 1868, March 12th, Mr. Morris called on me, and stated his wish to pay it, as he had the money then ready. I expressed my astonishment at the proposition, and positively refused to receive it. He then declared his right to do so, and stated that if I declined *471 receiving it, it would be reported to the commissioners, and the debt taxed as if of gold value. I still refused. He afterwards saw Mr. Howison, with whom I afterwards conferred, when, in view of all the circumstanees under the laws then existing, and then in course of enactment, we considered it safest for the estate to receive the money.” Another of the peculiar circumstances aforesaid is,
3d. Every debt paid to the executors after the 1st day of January 1863, as aforesaid, was secured by a lien on real estate in the city of Richmond, the destruction of which real estate would have endangered the loss of such debt in whole or in part; and all buildings in the city were, during almost the whole war, in danger of being destroyed by fire, in the event that the armies of the enemy, which were around the city, trying to force an entrance therein, should succeed in capturing it—an event which was often apprehended. It was feared that on the happening of such an event the whole city, or the greater part of it, might be reduced to ashes. When at last the city did fall into the hands of the enemy, after its evacuation by our army, many buildings were burned down and much valuable property was destroyed in the city. The property on which the liens aforesaid existed happened to escape destruction on that occasion, but it was a mere accident. Some of tbe said property was peculiarly exposed to such destruction, as, for example, the Exchange hotel, which, it is said, was near being burned down, and the wonder is that it was not. The state court-house, I believe a fire proof building, standing by itself on the capitol square, was burned down on that occasion, and with it were destroyed many valuable records and much valuable property which had been deposited therein as a place of the greatest *472 sa**etJ iQ the city. All the bonds, notes, stocks and other valuable papers belonging to the estate of Hicholas Mills, deceased, which were by his executors put in a tin box and deposited in a bank in the city, were burned up with the bank on that occasion, notwithstanding all the efforts which were then used to save them. Certainly it was a most material circumstance to be weighed in determining whether it would be proper to receive payment in Confederate money of a debt due in good money, the security of which was dependent only or chiefly on a lien on a building in the city of Richmond, that it was exposed to the danger aforesaid, against which no insurance could be obtained. The Confederate money so received might have been invested in a Confederate bond, which would no doubt have been good in the event of the success of our cause, which might well have been gained, though the buildings subject to the lien, and even the whole city, had been destroyed by the enemy.
I will now take some further notice of the different instances in which the executors, Mills and Howison, are charged with having, since the first of January 1868, improperly received in Confederate money payment of debts due to their testator’s estate in good money; and in so doing I will pursue the order in which those instances are before stated in this opinion. They are,
1st. Thomas Bradford’s bond for one thousand dollars, payable first of January 1863, and paid to the said executors on the 3d of the month.
This payment was made very recently after the testator’s death. Had it been made but four days before it was made, that is, in 1862, it would not have been embraced within the period to which the objection has been limited.
*473 2nd. A bond of tbe Exchange hotel company for ten thousand dollars, paid on the same day out of the proceeds of the sale of the Exchange hotel, made on the 24th of November 1862; so that the payment may be considered as having been made on the latter day, exactly two months after the qualification of the executors, and is therefore not within the limit of the -objection aforesaid. But the testator was himself a very large stockholder in the company which owed this bond, and had received in Confederate money after the date of his will, and before his death, a large payment on account of the debt due him by the company.
3d. The sum of $19,000, par value of one hundred •and ninety shares of the stock of said company, owned by the testator, which said sum of money was paid to the said executors out of the proceeds of said sale. The propriety of the act of the executors, in receiving this payment, is too manifest to require further ..commentary.
4th. A debt of $9,268.88, paiyd by Charles Y. Morris to the said executors on the 12th of March 1863, . being the principal and interest of a bond due by him to the testator. Enough has already been said in regard to this payment.
5th. A debt of $1,360, due by note of L. W. Glaze-brook, paid to said executors on the 12th of March 1863, and a debt of $1,330, due by note of same debtor, and paid to said executor on the 19th of April 1864. The latter is the only debt of which payment was received by the executors in Confederate money after April 1863. Glazebrook, it seems, owed a large debt to the testator, payable in annual instalments. Two of them became payable during the war, and were paid ■«bout the time of their, maturity to the executors. *474 Another probably became payable just before the end! of the war, but payment of that was not received by the executors. There remained due by Glazebrook to ^stator at the end of the war a balance of $13,030. 6th. A debt of $26,666.67, paid to the said executors. on the 29th of April 1863, by Lancaster and others, purchasers of the Exchange hotel property, to-exhinguisli ground rent reserved on a lease from testator to said hotel company. I think I have already shown that any one'or more of the executors had the-same power to receive payment of this debt as of any other debt due to their testator’s estate, and therefore-there was at least as much propriety in receiving such payment in Confederate money as in receiving payment in such currency of any other debt which was-paid to them about the same time. There are other-circumstances, however, connected with this debt,, which seem to increase the propriety of so receiving-payment of it. The testator must have expected that this ground-rent would soon be redeemed by the payment of the gross sum aforesaid, and must have in- . tended that such payment might be made in Confederate money, for it could be made during the war in-no other currency. If he had supposed that the rent-charge of $1,600 per annum, payable quarterly, would remain a- perpetual rent charge, he would certainly have named it in his will, and expressly directed therein in what manner and for whose benefit such an important subject should be disposed of. But believing that the lessees or their assigns would soon avail themselves of the privilege of redeeming it, by paying the stipulated sum in gross to his • executors, he-saw no reason for naming it in his will any more than the other debts which were due to him. His estate was deeply interested in the Exchange hotel pro *475 perty. Besides the perpetual rent charge redeemable as aforesaid, the company owed him at his death a debt of $10,000; and he owned 190 shares of stock, being, it seems, the largest stockholder in the company. There was great difficulty in renting out the property, and great danger of its destruction in the event of the city’s being captured by the public en- • emy. It was therefore unanimously resolved by the company to sell the property at public auction, provided it could be sold without too great a sacrifice. Accordingly it was sold at public auction in November 1862. It was all important to Mr. Mills’s estate that the sale should be made to the best possible advantage; and it was proclaimed at the sale by the auctioneer who made it, and in the presence of the executors, Mills and Howison, who were there, that the purchaser would have a right, under the lease, to redeem the rent charge by payment of the gross sum aforesaid, whenever he.chose to do so. Accordingly Lancaster and others became the purchasers at the said sale, at a price which was much higher than was expected to be obtained for the property. And the consequence was that the executors received out of the proceeds of sale, not only thé amount of the debt of $10,000 due to tbeir testator’s estate by the company, but also $19,000, being the par amount of his one hundred and ninety shares of stock in said company, though stock therein had been sold as low as twenty-five dollars per share before the war. In April following the sale, the purchasers redeemed the rent charge, by tendering and paying to the executors the gross sum aforesaid in Confederate money. It was payable under the lease, bearing date the 81st of July 1839, “in current money of the United States,” which, at the time of payment, was an unlawful currency in the *476 Confederate States, and was a depreciated currency in the United States. It appears, I think, from what I have already said, that if the debt had been payable consti|;Utionai currency, the executors would have heen warranted under the circumstances in receiving payment of it in Confederate money. A fortiori, were they so warranted, payable as it was “in current money ^e United States.” .
The executors did not conceal their action in this matter nor any other connected with their administration of the testator’s estate, but acted openly, and no doubt with the knowledge of all the legatees who were old enough to have such knowledge. At least, those legatees might easily have become informed on the subject if they so desired. They very promptly returned an inventory of the estate and had it recorded; and they yearly settled their accounts during the war before a commissioner in chancery, which accounts were duly returned and filed for exceptions, and, being unexcepted to, were duly recorded. In these accounts all payments made by them were duly entered.
In regard to the investments made by the executors of Confederate money in eight per cent. Confederate bonds, if the money was properly received by them, it was certainly properly invested. "We all yet well remember that during the earlier period of the war, and as late perhaps as the end of the year 1863, it was generally, if not universally, considered in the Confederate States that the best possible investment of Confederate money was in Confederate eight per cent, bonds, unless the money was employed in the purchase of cotton and tobacco or used otherwise for purposes of speculation, which could not properly be done with trust funds. By so investing the money in this case as soon as it could be done after it was received (except so *477 much as could be paid in discharge of legacies, which was accordingly paid), the largest possible revenue, payable semi-annually and punctually, was obtained for the legatees. They received Confederate money from the executors without objection; for they knew the executors could get no other for them. And they made no complaint of any act of the executors, in receiving such money or otherwise, until after the end of the war, when the suits were brought which are the origin of this controversy.
I am therefore of opinion that the executors, in performing the acts complained of in this case, acted in good faith and in discharge of what they believed to be their duty as executors.
I have cited but one authority in the foregoing opinion, and that was upon a particular question arising in the case. I will cite but one other, which, I think, is conclusive in favor of the' executors—I mean the case of Myers’ ex’or v. Zetelle, 21 Gratt. 733. This court was unanimous in the decision of that case, and the principles on which the decision was founded directly apply to this case. The features of the two cases are-very much alike, and most of what was said by Judge Christian, in his able opinion in that case, is as appropriate to this case as it was to that, if not more so. I am strongly tempted to repeat here a good deal of what was said there; but my opinion is already so long, that I must content myself with merely referring to the report, and especially to pages 750, 752, 754, 755, 756, 758, 761. A good deal has been said about the unlimited powers of the agents in that case. But certainly the executors had the amplest powers to do-what they did in this case, and there can therefore be-no difference between the two cases in that respect. -When powers are ample to do a certain act, there can *478 no increase of such powers to do that act. The only difference between the two cases in that respect seems to be that in this the executors were in effect ezpregg]y directed to do the acts complained of, wi*ereas in that the agents had a discretion to do or not to do them. The agents and executors both were invested with trusts which they had no right to break; and they were both liable, and equally so, for any losses arising to others from such breaches of trust.
Being of opinion that the executors were not guilty of any breach of trust in this case, it follows, as a matter of course, that none of those who dealt with them, whether as purchasers or debtors, can be liable for participating in any such breach of trust.
At the suggestion of my brother Burks, made since the foregoing was written, I will cite one other authority, which I also think is conclusive in favor of the executors—I mean the case of Staples & als. v. Staples & als., 24 Gratt. 225, decided in 1874, after the case of Myers’ ex’or v. Zetelle, which was decided in 1872. The court was unanimous in that case also, at least so far as it is applicable to this—Judge Staples, who was related to some of the parties, not sitting in the case. The features of that case and this are very much alike, and the principles on which the decision in that case was founded directly apply to this. Much of what was said by the court in that ease, is at least as applicable to this case as to that, and would be repeated here but for the reason before stated. I therefore content myself with referring to the report of the ■case, and especially to pages 232, 236, 248 and 249.
It may be proper also to notice briefly some recent -decisions of this court, which were referred to in the argument of this case, as modifying, to some extent, the doctrine of the two cases just referred to, and *479 tending to show that it is inapplicable to this case. They are Campbell’s ex’ors v. Campbell’s ex’or, 22 Gratt. 649; Moss, &c. v. Moorman’s adm’r &c., 24 Id. 97; Williams’ adm’rs v. Skinker & wife, 25 Id. 507; and' Hannah’s adm’r v. Boyd, &c., Id. 692, decided in 1872, 1878, 1874 and 1875, all of them having been decided •after the case of Myers’ ex’or v. Zetelle, and two of them after the case of Staples & als. v. Staples & als.; but all six of these eases having been decided by this ■court within a period of less than three years. In neither of them is any question raised as to the authority of any of the rest; and it cannot be supposed that the court intended in any one of them to change or modify the doctrine of any of those which preceded it, and still less the doctrine of either of the two cases of Myers’ ex’or v. Zetelle, and Staples & als. v. Staples & als., which had so recently been fully and ably argued by counsel, and maturely considered by the court, and concurred in by all the judges present at the decision of those two caseB respectively. These cases are, I think, all consistent with each other, although there may be in some of them expressions which, taken from the context, may appear to be inconsistent with other expressions to be found in other cases.
In Campbell’s ex’ors v. Campbell’s ex’or, the executors of J. B. Campbell called in a debt due in good money to their testator’s estate and perfectly secure, for the purpose of investing the amount in Confederate bonds, Confederate money being then at a great depreciation. And their motive for making the change of investment was the gain which they and their brothers, who owed the debt, would thereby realize. This court held that “ it was a devastavit to call in that debt or any part of it for the purpose of making an investment in Confederate bonds. The investment act contained an ex *480 Press Proviso that nothing therein contained should. authorize a fiduciary to change the character of an. existing investment.”
In Moss & wife v. Moorman’s adm’r &c., it was held' ^at " a Persona' representative is not warranted in receiving a specie debt due to the decedent’s estate in a 0 * greatly depreciated currency—depreciated to the ex-ten^ which it was depreciated when the money was-received by the representative in this case—unless-there be something in the condition of the debt, or in the state of the demands of creditors or legatees of' the estate, or otherwise, which makes it'to the interest of the estate that the debt should he so received.” “In this case,” said the judge who delivered the opinion in the case, in which two of his brethren concurred, and in the results of which all the judges concurred, “it is not pretended that the debtor was not perfectly solvent and likely to continue so at the timo his debt was received by the administrator of the creditor; nor that the collection of the debt was required for the purpose of being paid to creditors or legatees of the deceased. The money was not in fact paid to-creditors or legatees after it was received by the administrator, hut was either used by him for his own purposes or remained in his hands until after the war; on which subject there seems to he no evidence in the-record. Where, then, was the necessity or propriety of receiving it in a depreciated currency—depreciated, it is said, to the extent of eight and a half to one as-compared with gold ? How was the estate benefited thereby?” Surely it cannot be necessary to say anything more than what is said in the context before-stated, to show that it is not at all inconsistent with either of the two cases referred to and relied on as governing the case under consideration. A prudent *481 man, in the management of his own affairs, would not, with a view to his own worldly interest, have received payment of a debt due to himself in good money, well secured in a currency depreciated to the extent of eight-and-a-half to one as compared with gold, unless he had some very good reason for doing so, such as the payment of a specie debt, the supply-of his necessary wants, the purpose of speculation, &c. A personal representative, therefore, ought not to receive payment of a well secured debt, due to a decedent’s estate in such a depreciated currency, in the absence of some good reason making it his duty to do so. In the absence of such a reason, the debt, being perfectly secure, ought to be permitted by the personal representative to remain as it is, and not be collected in a depreciated currency merely for the purpose of changing the investment, however secure the new investment may be considered ultimately to be. If he should make such a collection and reinvestment, and the new investment should turn out to be worthless, it would be reasonable to hold him liable as for a devastavit. In the case of Moss &c. v. Moorman’s adm’r &c., there was not even a° reinvestment in a Confederate bond or otherwise.
In Williams’ adm’rs v. Skinker & wife, Williams, the executor of Hite, received payment in depreciated Confederate money of a well-secured specie debt, well knowing at the time that he had no authority to receive such payment, except with the consent of the legatees, to whom it belonged, one of whom did not consent, and against whose claim the executor received from another party such indemnity in Confederate money as was deemed to he sufficient. The executor was held to be liable to the non-consenting legatee after the war for her portion of the debt in good money. Surely it cannot be necessary to say anything *482 more *° s^ow the consistency of that case with the other cases before referred to.- But I will quote here remark contained in the opinion of Judge Christian ^at eage^ -n wyc]a a majority of the judges concur-re^’ remai’k is certainly very just, and is stated by the reporter in his syllabus of the case as one of the points therein decided; that “it is difficult to lay down anJ general rules applicable to all cases which arise out of dealings by executors during the war. Each case must depend upon its facts and the circumstances at the time surrounding the executor.”
In Hannah’s adm’r v. Boyd wife &c., the same remarks apply as were made in reference to Moss &c. v. Moorman’s adm’r &c.
And if there be any other decision of this court which may seem at first glance to be inconsistent with the cases of Myers’ ex’or v. Zetelle, and Staples &c. v. Staples &c., the apparent inconsistency will doubtless disappear on looking to the context.
I base my opinion in this case “ upon its facts and the ch’cumstances at the time surrounding the executors,” according to the rule laid down in Williams’ adm’rs v. Skinker & wife. Those facts and circumstances have already been fully detailed. The executors acted under a will, made in the midst of the war, when Confederate money was almost the only currency. It conferred on them the greatest powers, and clothed them with very many important trusts. It empowered and directed them expressly, or by plain implication, to sell all his estate, real and personal, except slaves, and specific devises and bequests, and to collect all his debts, so as to have all his estate, except as aforesaid, in their hands, in the form of money or u funds,” to be applied as soon as possible to the payment of his debts, and the many legacies given by the *483 will to his large family of children and grandchildren, most or many of whom seem to have been dependent on their interest in his estate for their means of sistence. He lived nearly a year after the date of his will, and made no alteration in it. On the contrary, he continued until his death to receive payment of specie debts due him, and well secured by liens on real estate, in Confederate money, though greatly depreciated as compared with gold, and to invest the money so received in Confederate bonds, plainly signifying to his executors that he wished them to pursue the same course in the administration of his estate after his death. .He thus received in 1862 the whole amount of the debt due him from Lewis Hyman, $7,500; one-half of the debt due him from Charles Y. Morris, $9,000; $1,000 of the debt due him from Thomas Bradford, all mentioned in the fourth clause of his will, which provides for the payment of the legacy thereby given to his daughter, Mrs. Robinson. Thus showing that he intended that his executors should collect the debts mentioned in that clause, or such of them as might remain uncollected by him at his death. Hnder these circumstances the testator died, and his executors qualified as such, and proceeded diligently to execute his will according to its plain directions, making sales of his property and collections of his debts in the only currency in which they could possibly be made, and making them under the peculiar circumstances which have already been fully recounted. But I have said enough in the case, and therefore will say no more than to conclude that, upon the whole, I am for affirming the decree appealed from; and I'entirely concur in the able opinion of the learned chancellor who pronounced that decree.
*484 Christian, J.
The magnitude of the interests involved, and the interesting and difficult legal questions-out of it, render this one of the most importaQt cases that has yet been submitted to the decision 0f this court.
The oral argument occupied two weeks, while the-printed notes of counsel cover nearly five hundred PaSes- The record is proportionately voluminous. The case has been argued by a number of able and distinguished counsel, who have exhibited their accustomed zeal, ability and learning in maintaining the-interests of their respective clients.
These considerations have united to induce the court to give to this important case the most deliberate and careful investigation, and constitute my apology for-the unusual length of this opinion.
This case is for the second time before this court. It is the sequel of the eases of Corbin & als. v. Mills’ ex’ors & als., Robinson v. Mills’ ex’ors & als., and Lancaster & als. v. Corbin & als., reported in 19 Gratt. 438.
In the third named cause this court made the following decree: “The court is further of opinion, that,, while the court will take judicial notice of the fact that on the 13th day of April 1863, the date of the-transaction which is the subject of controversy in this cause, the treasury notes of the United States, and also the treasury notes of the Confederate States, were greatly depreciated in value as compared with specie,, it is not competent for the court to take judicial notice of the rate of depreciation of either currency at any particular time, nor of the extent to which at any particular time the treasury notes of the Confederate States were available, according to the common usages-■of business, for the payment of debts contracted before the war and payable in specie or in current money of *485 the United States, or for the purchase of property, or ■otherwise. The court is further of opinion, that inasmuch as the record in this cause contains no evidence upon these points or either of them, it does not contain sufficient materials to enable the court to make a proper decision upon the questions, in controversy. The court is therefore of opinion, that the said circuit court, instead of proceeding to make a decree upon the merits of the controversy in the existing state of the record, should have directed an enquiry by a commissioner to ascertain what was, on the 13th day of April 1863, the value, as compared with specie, of the treasury notes of the United States and also of the treasury notes of the Confederóte States, and to what extent, at that time, the treasury notes of the Confederate States were, according to the common usages of business in Richmond, available for the payment of debts contracted before the war and payable in specie or current money of the United States and well secured on real estate, or for the purchase of property, or otherwise, with leave to any of the parties to file additional ■evidence as they may be advised upon any matter involved in the cause.” And the cause was remanded to the circuit court for further proceedings to be had therein in accordance with this decree.
After the causes were remanded to the circuit court, the plaintiff in the suit of Corbin v. Mills’ ex’ors & als. filed an amended and supplemental bill, alleging his objections to the settled accounts of the executors.
The bill charges the executors with an improper and illegal administration of the estate of their testator and a violation of their duties as executors and trustees under the will. The particular specifications may be best stated as follows:
1. That the two executors had no authority to sell *486 the Leigh street property for Confederate States treasury notes, without the consent of the beneficiaries under the will and the concurrence of the third execu- £or. ancj -th.at the deed of the two executors transferred n0 title to the grantees; and that the same were and are illegal and void.
2. That the will of bTicholas Mills did not confer uPon his executors authority to invest the residuary estate given by the fourteenth clause to the grandchildren of the testator, nor to make any investment whatever, except under the fourth, tenth, eleventh twelfth and thirteenth clauses of the will; and that the legacies bequeathed by the thirteenth clause should have been paid to each of the grandchildren named therein as were of age.
8. That the executors had no authority to collect in. Confederate States treasury notes, especially at their nominal value, well secured debts due in specie or its equivalent—and in this connection the debt of Bradford, Morriss, the Midlothian coal mining company,, the Exchange hotel company, Glazebrook, and the stock of the Exchange hotel company, are enumerated; and the bill charges that these payments, made in this currency so greatly depreciated, did not discharge the debtors.
4. That the authority given to the executors' by the eighteenth clause of the will to change investments,, did not apply to the residuary legatees, and is not binding upon them, but was only applicable to investments made under the fourth, tenth, eleventh, twelfth and thirteenth clauses of the will.
5. That the executors had no authority to invest in Confederate States bonds, because they were hazardous and unsafe, and the will required the investments it did authorize to be safe investments.
*487 6. Reference is made in said supplemental bill to the pending suit of Corbin v. Lancaster, as exhibiting the grounds of objection to the sale of the Exchange f . J hotel ground rent.
This bill was answered by the executors Howison and Mills', who controvert and put in issue all the material allegations of the bill.
Much evidence was taken- upon the points of enquiry directed by this court by its decree of the 13th day of March 1869; voluminous reports and accounts were returned by the commissioner of the court; and on the 4th day of March 1872 the chancery court of the city of Richmond pronounced its decree, by which it declared, and so adjudged, ordered and decreed: Eirst, “that the sale of the real estate in the bill mentioned, made by the two executors, Robert R. Howison and Charles S. Mills, was valid, and that their deeds conveyed a good title to the purchasers thereof; and that the third executor after his qualification in effect ratified the same; nor was the consent of the beneficiaries under the will necessary to authorize said executors to sell said real estate.”
Second. That the executors were authorized under the will to invest the residuary estate given by the fourteenth clause thereof, and that the investments so made by them were legal and valid.
Third. That the said executors were authorized by the will to collect the debts due from Messrs. Morriss, Bradford, Glazebrook, and the Midlothian mining - company, and from all others who were debtors to their testator, and that their collection of said debts in Confederate money was valid, and fully discharged ’ the debtors.
Fourth. That the sale of the Exchange hotel stock was made in consequence of the dissolution of the *488 comPany by the action of a majority of the stockholders, and that the executors were right in receiving the share of the proceeds of such sale belonging to estate of their testator in Confederate money.
Fifth. That the rent charge on the Exchange hotel property was, in substance, a mortgage, by which the sum of $26,666.60, with six^er cent, interest, was secured> and being so, stands upon the same footing as the other debts due to the testator, and the executors were authorized to collect it, and the collection of the same in Confederate money was valid, and discharged the debtor; and that the deed of the executors, releasing the lien on said property, was a valid and legal discharge of the same, and that they are not liable for any loss that has subsequently occurred in consequence •of such collection and release.
Sixth. That investments made by said executors, in Confederate States bonds, were legal and valid, and that said executors are not liable for any loss sustained by reason of such investments.
From this decree an appeal was allowed by one of the judges of this court.
The first question we have to determine is as to the validity of the sale made by the executors, of what is known in the record as the Leigh street property. This sale is objected to, and its validity assailed upon two grounds—-first, that three executors having been appointed by the testator to execute the trusts of his . will, the sale and deed made and executed by two, in the absence of the third, was a void act, and conferred no title on the purchaser. Second, that if the two acting executors had the authority to sell and convey this valuable real estate in the absence of the third (who had not then qualified, and who did not unite in the deed), still they had no authority to sell the same *489 "for Confederate currency, and consequently both the acting executors and the purchasers are liable to the legatees for the full value of the said real estate in a sound currency.
These propositions will now be considered in the ■order in which they are stated above.
Nicholas Mills, the testator, died on the 13th September 1862. He left a will, which had been duly executed on the 17th day of October 1861. He appointed as his executors his son, Charles S. Mills, his .grandson, Thomas Verney Eobinson, and Eobert E. Howison, an attorney of the city of Eiehmond, who had been for many years the counsel of the testator. On the 24th September 1862 the will was admitted to probate, and Charles S. Mills and Eobert E. Howison, two of the executors named, qualified, as such, and liberty was reserved to. Thomas Verney Eobinson, the other executor, to join in the probate if he thought fit. He qualified on the 15th December 1862. At the time the will was offered and admitted to probate, on the motion of Mills and Howison; Eobinson was a •soldier in the army of Northern Virginia. An effort was made to get a furlough for him, in order that he might be present when the will was offered for probate, and qualify with the other two executors. This effort failed, and it was at least uncertain and the time indefinite when he could qualify as one of the executors.
The testator, by the fourteenth clause of his will, made the following direction: “All the real estate which I may leave at my death, not otherwise specially disposed of, I desire my executors shall sell in such manner and on such terms as they may deem most •advantageous.”
On the 28th October 1862, the two executors who *490 qualified, Mills and Howison, made sale of the-Leigh street property for the sum of $128,236.30, in Confederate money, and executed deeds to the purchasers. The third named executor, Robinson, was not Presen^ at sale, and did not unite in the deed, he not having qualified as executor when the sale was made. It is earnestly insisted by the counsel for the aPPeOants, that the deeds of the two executors conferred no title on the purchasers, but that in order to make a complete title in the purchasers, all the executors named in the will should unite in the sale and join in the conveyance. This was undoubtedly the rule of the common law. That rule was modified by the statute of 21st' Henry viii, chapter 4, which provided, that “where lands are willed to be sold by executors and part of them refuse to be executors, and to accept the administration of the will, all sales by the executors, that accept such administration, shall be as valid as if all the executors joined.”
The statute of Henry the viii, which was in force in Virginia at the time of the revolution, required a refusal to act by the person nominated. In 1785 the law was so changed by act of assembly as to authorize such as should “undertake the execution of the will” to sell and convey. The statute was reenacted in 1792, with this additional provision: “But if none of the executors named, in the will shall qualify, or after t^ey have qualified shall die before the sale and conveyance of such lands, then, in these cases, the sale- and conveyance thereof shall be made by such person or persons to whom administration of the testator’s estate, with the will annexed, shall be granted.” IRev. Code 1819, p. 388, § 52.
The object of these amendments was plainly to extend the policy of the statute of Henry the viii, which, *491 required a refusal of one of the executors to qualify before the others could act, and to confer the power to sell upon those who qualify. See Mosby’s adm’r & als. v. Mosby’s adm’r. Opinion of Judge Moncure, 9 Gratt. 584, 598.
The provisions of our Code, which constituted the statute law of this state, when the executors made the sale, the validity of which is impeached, is found in the first section of chapter 130, Code 1860, and section 1,-chapter 131, and are as follows:
“A person appointed by a will executor thereof, shall not have the powers of executor until he qualifies as such by taking an oath, and giving bond in the court in which the will or an authenticated copy thereof is admitted to record, except that he may provide for the burial of the testator, pay reasonable funeral expenses, and preserve the estate from waste.” Gh. 130, § 1, Code 1860.
“Real estate devised to be sold, shall, if-no other person other than the executors be appointed for the purpose, be sold and conveyed * * * * by the executors who qualify and the survivors of them.”
In this case the sale was made by the two executors who had qualified. Robinson did not qualify until after the sale was made and the deeds executed to the purchasers. When he qualified, he was invested with all the rights and powers of an executor in and upon the estate of Nicholas Mills. But at the time of his qualification, the real estate (the Leigh street property) had been sold by the executors who had qualified. Robinson’s powers as executor then attached only to the estate of his testator not then'disposed of, and his securities on his official bond could be held only responsible for the assets, real and personal, which came into the hands of the executors after his qualification. *492 When he qualified as executor, the Leigh street property was no longer a part of his testator’s estate. It had been sold by his co-executors who had qualified before him, and his only responsibility was for the application of the proceeds of the sale. The law in express terms, vested all authority and power to sell the real estate directed to be sold by the will, in those w^° hud qualified as executors. They had executed that power before Eobinson qualified, and there was neither power nor responsibility attaching to him as to that sale.
Of course, it is not intended in this view to assert that one executor may, because he happens to qualify first, in hot haste and in fraud of the rights of his co-executors, and of those interested in the estate, proceed to sell his testator’s real estate authorized to be sold. No such case is made in the record. In this case an effort was made to get the presence of the third executor. He was then in the army and it was altogether uncertain when he could return. Under the circumstances the other two were justified in acting without him. But in point of fact there is nothing in the reeoi’d to show that Eobinson ever objected to the sale by his co-executors until after the close of the war. He saw the purchasers put in possession of the property without objection. He expressed himself gratified at the large price for which the propeifiy had been sold, and he received his part of the commissions of the sale, and stoutly contended for his part thereof against the other two executors. Not a word was said by him by way of objection to this sale, until after this suit was brought; but all his acts and conduct showed a full ratification of what had been done by his co-executors, and conclusively shows that if he had been present he would have *493 ■united with his co-executors in making the sale and would have joined with them in a deed to the purchasers.
But however this may be, I am of. opinion that the executors who qualified had the authority under the will of the testator to make sale of the “Leigh street .property,” and to convey to the purchasers a valid title to the same; and that that title is in no way affected by the fact that one of the executors named in the will did not unite in said deeds, he not having then qualified as such executor; and that the title in the purchasers is as complete and perfectas if all the executors had united in said deeds.
But the validity of this sale was impeached on another ground, as before stated, to wit: that if the two acting executors had the authority (in the absence of the third executor) to sell this valuable real estate, they had no authority to sell it for Confederate money; that in this they exceeded their authority, and that therefore the sale was void, and the deeds conveyed no title.
This objection makes it necessary to recur again to the will, which is the source of power, and to note carefully the circumstances under which the sale was made. The 14th clause of the will, before recited, is as follows: “ All the real estate which I may leave at my death, not otherwise specially disposed of, I desire my executors shall sell in such manner and on such terms-as they may deem most advantageous.”
Here the largest power is conferred on the executors. They are to sell in such manner and on such terms as they may deem most advantageous. Whether it was most “advantageous” to the estate they represented, to sell in October, 1862, they were to be the sole judges. Whether they should sell then, or at a later period, or- *494 PostPone ^Ie sale until after the close of the war, was a matter left by the will entirely to their discretion. Eor was this discretion at all limited by the fact that aj. ^me Q]p gaiej the. only currency in circulation was Confederate money. The testator did not direct a sale for specie or its equivalent, but simply directs his executors to sell “in such manner and on such terms as t° them may seem most advantageous.” It is a noteworthy fact, that at the time the will was executed, (October, 1861) the war was raging and Confederate money was then coming into general circulation, and at the time of his death, (September, 1862,) from which latter date his will speaks, Confederate money constituted the principal if not the whole currency of the country. The testator himself had received, for the sale of property and in the payment of debts due him, about ¡§19,000 in this currency. .Thus knowing as he did, that there was no other currency in circulation but Confederate money, he did not limit the power or discretion of his executors, but without limitation or qualification conferred on them the power to sell his real estate “in such manner and on such terms as they may deem most advantageous.” At the time of this sale the depreciation of Confederate money was comparatively small, being about two and a half for one, and was generally received in payment of •debts, as well as for real estate sold. The Leigh street property was sold for $128,286.80. It was assessed in .1859 at $28,850. It therefore sold for a price which, if converted into gold, would have produced at least $50,000. The purchasers thus paid more than full value for it, and the sale at this large price might well have been considered by the executors, as it was by ■others, as “advantageous.” ■ But whether “advantageous” or not, having full power to sell, neither the *495 executors nor the purchasers in the absence of fraud, can be held liable to the legatees for any loss incurred in consequence of such sale.
I am therefore of opinion that there is no error in the decree of the chancellor, which declared “that the ■sale of the real estate, in the bill mentioned, made by the two executors, Robert R. Howison and Charles S. Mills, was valid, and that their deeds conveyed a good title to the purchasers thereof,” and that the said decree to this extent should be affirmed.
We come now to consider the second branch of this important case, which presents questions of great interest and difficulty, to wit: How far are these executors liable for a breach of trust in collecting debts due their testator in a sound currency, well secured upon real estate in the year 1863 in Confederate money, then depreciated to at least five to one; and if liable, how far the debtors and purchasers of the real estate, pledged as security for these debts, are to be regarded as pai’ticipators with the executors in such breach of trust, so as to make them liable with the executors?
Among the assets of this large estate, which came into the hands of the executors, were certain debts of large amounts, amply secured upon valuable real estate. They are known in the record as the Exchange hotel rent charge, the Morris debt, the Midlothian coal mining company debt, and the Glazebrook debt, all of which were well secured upon real estate, of such value.as to make them perfectly safe, and all of which were collected in Confederate money in 1863 by the executors, and release deeds executed by them of the real estate, which stood pledged for their payment.
As the Exchange hotel rent charge stands upon *496 somewhat different grounds from the other above-named debts, that will be'first considered.
On the first January 1839, Nicholas Mills and Sarah his wife “leased, demised, granted, and to farm let,”' unto Hugh W. Fry and others, for a hundred years, certain valuable real estate in the city of Richmond, formerly the site of the old Byrd warehouse, and now of the Exchange hotel, charging the same with an annual rent of $930, payable in equal annual instalments for one year, from January 1st, 1840, to January 1st, 1841; and thereafter for the ensuing ninety-nine years, with an annual rent of $1,600, payable likewise in equal quarterly portions.
In the contract of lease, it was stipulated that the property should be conveyed to the lessees absolutely in fee simple with general warranty at any time after January 1st, 1840, upon the following condition: “ On receiving from the said parties of the second part, their heirs or assigns, the sum of $25,000, current money of the United States, and all rents that shall have accrued on the premises hereby demised, to the time of such payment of the $25,000 aforesaid; and at any time after the expiration of five years, from the first day of January, in the year 1840, during the term hereby granted, to convey the premises hereby demised, with all houses, buildings and improvements thereon, and appurtenances thereto belonging, or in any wise appertaining to the said parties of the second part, their heirs and assigns, in fee simple, with general warranty, on receiving from the said parties of the second part, their heirs or assigns, in current money of the United, States, a sum which will be sufficient to produce in interest thereon at the rate of six per centum per annum, sixteen hundred dollars, like money, in quarterly payments.
*497 There was thus secured upon this valuable property at the death of the testator an annual rent of $1,600, payable quarterly, in current money of the United States, with the privilege to the lesses to obtain from the lessors a fee simple title upon the payment of a sum sufficient to produce, in interest thereon at the rate of six per centum per annum, the sum of $1,600, like money, in quarterly payments. The sum required to produce this amount was $26,666.66-§.
On the 30th April 1863 the two executors received this amount in Confederate money, and executed a deed releasing the rent and rent charge created by the deed of January 1st, 1839. At the time they received this large amount due in specie, Confederate money was depreciated to the extent of five and a half to one. Thus by this transaction, for a specie debt of $26,666.66f, secured upon ample and unquestionable security, and paying in quarterly payments $1,600 per annum, these executors received what was worth a little over $5,000. And, strange to say, it was thus collected, not to pay debts or legacies, but to be invested to produce a fund out of which annuities were to be paid under the will. This, at least, was the pretence. The will had directed the executors to invest in “productive stock, or in a safe loan on good real or personal security,” any surplus funds remaining after payment of debts and legacies. But this sum was already invested; and what better investment or safer security could possibly have been made or desired? The bare ground had been assessed at upwards of $10,000, and the hotel built upon it had cost in good money $125,000. For a series of years it had rented for $10,000 per annum in gold. Thus the principal rent charge was secured on property worth at least $135,000; and the annual income of $1,600 had a cor- *498 resP0D^E1g income of $10,000 out of which to be punctually satisfied quarterly. It is difficult to con-of a better investment or a safer one than this. rpQ suc]1 aa investment, and to receive a specie 80 well secured, in Confederate money, so greatly depreeiated, cannot be excused or justified on any ground.
And the same may be said of the Morris debt, the Bradford debt, the Glazebrook debt, and the Midlothian company debt (and others, if there be any, of like character); all of which were amply secured upon real estate, and were collected by these executors in a currency depreeiated at five or six to one; and this, too, at a time when they had on hand, from the sale of the Leigh street property and other sources collected by them, an enormous amount of Confederate money (after paying debts and legacies), and which they admit they could not loan out on either real or personal security, and were forced, for the want of better securities, to invest in Confederate bonds to the amount of $215,000. Such injudicious and reckless waste of the assets of this large estate cannot be justified or tolerated on any ground; and it is therefore needless to consider any of the grounds of excuse or justification offered by the executors or their able counsel. This court has in four successive decisions put the seal of its condemnation upon such conduct on the part of fiduciaries, and in cases of no such palpable recklessness and gross negligence as this discloses: and if there ever was a ease where the rule stare decisis must prevail, it is the case before us.
. In Campbell’s ex’ors v. Campbell’s ex’or, 22 Gratt. 649, 686, Judge Moncure, speaking for the whole court, said: “The debt to the estate on account of these notes and bonds was, therefore, most amply se *499 'Cured; and it was a devastavit to call in that debt, or any part of it, for the purpose of making an investment in Confederate bonds. The .investment act contained an express proviso that nothing therein contained. should authorize the fiduciary to change the character of an existing investment. * * * As to the sums of $1,200 received of Pullins, and $2,500 received of Stephenson by the executors in the summer of 1863, in Confederate notes, which their counsel insist were received in due exercise of their trust, we think, for reasons already assigned, that they had no right to receive the said sums for said purpose, and therefore did not receive them in due exercise of their trust.”
In Williams’ adm’rs v. Skinker & wife, 25 Gratt. 507, it was said, “there may be cases in which an executor may be held justified in receiving Confederate money, .greatly depreciated, for a debt payable in a sound currency, as where the necessities of the estate require it, where it could be used in payment of the debts of the testator, or where (there being no debts) legatees or the parties entitled to distribution consent to receive it, or where the security for the debt has become doubtful and the estate would be benefited by receiving even a depreciated currency.” And it was held that the collection of an ante war debt, well secured on real estate (and not being necessary for the payment of debts), in Confederate money, in November 1862, without the consent of the legatees to whom it was secured and payable, was a devastavit, and, though no mala fides was attributed to the executor, he exceeded his powers as executor in receiving Confederate money for a specie debt well secured, and, under the circumstances of that case, was held liable to the legatees.
*500 In Moss & wife & als. v. Moorman’s adm’r & als., 24 Gratt. 97, Judge Moneure said (and all the judges con-“A personal representativé is not warranted .q reeeiviUg a Speeie ¿ebt due to the decedent’s estate *n a g“’eat]y depreciated currency—depreciated to the extent to which it was depreciated when the money was received in this ease (1863)—unless there be something in the condition of the debt, or in the state of the demands of the creditors or legatees of the estate, or otherwise, which makes it to the interest of the estate that the debt should be so received.”
In Hannah’s adm’r v. Boyd & wife & als., 25 Gratt. 692, Judge Staples, delivering the unanimous opinion of the court said: “The doctrine of this court as expressed in several cases, is that a fiduciary is not warranted in receiving payment in a highly depreciated currency of a debt payable in gold or its equivalent, unless it can be made to appear (1) from the condition of the estate, or (2) the debtor, or (3) other circumstances, that the collection was expedient and proper. In the present case, nothing appears by the record, except the collection by the executor in Confederate currency in the year 1863 of a debt contracted long anterior to the commencement of the war.”
Upon these repeated and successive decisions of this court, we are bound to conclude that the executors in this ease, in receiving Confederate money as late as 1863 for debts payable in gold or its equivalent, and well secured upon real estate, have committed a devastavit for which they are personally liable.
And now the question recurs are the debtors who paid these debts in a depreciated currency, and the real estate pledged as security for these debts, and which has been released by the executors, still bound to make them good ? This depends upon the question *501 "whether they have so participated .with the executors in a breach of trust as to make them and the security pledged, still liable for the debt. The principle upon which a party dealing with a fiduciary is held responsible is that he has cooperated in the fraud of the fiduciary. Hunter v. Lawrence’s adm’r & al. 11 Gratt. 111. The fiduciary must commit a fraud and the third person must cooperate in that fraud in order to vitiate the transaction. In order to bind a party dealing with a fiduciary, there must be shown direct collusion between such party and the fiduciary to defraud the estate. . Such collusion cannot be predicated upon the mere fact that a debtor pays his debt to one authorized to receive it in a depreciated currency, when the person to whom the debt is due is willing so to receive it.
The cases above referred to show that there may be many cases in which the executor would be justified in receiving such currency in payment of an ante-war debt; as where the emergencies of the estate or the •condition of the debt requires it, where it can be used in the payment of debts and legacies, or where the security for the debt is doubtful (in the opinion of the ■executor) and where the estate would be benefitted by receiving even a depreciated currency. Of all these things the debtor cannot be presumed to have any knowledge. He is not in any way responsible for the right administration of the estate. It is for the executor and not the debtor, to judge of the exigencies of the estate which may require him to collect a debt in a depreciated currency. When the debtor pays his debt to one who had a right to demand it, and is authorized to receive it, and is willing to receive it in a depreciated currency, the debtor is forever absolved of his obligation, unless there can be shown fraud and *502 collusion between the debtor and the executor. The-case is altogether different from the ease of Pinckard v. Woods, 8 Gratt. 140, and the cases of Cocke v. Minor, and Jones' ex’ors v. Clark, 25 Gratt. 246, 642. In these cases there was a dealing between the executor and third' parties with the assets of the estate—under such circum- * J stances as imputed fraud to the executor, and brought home to the party dealing with him, notice of the-fraud. Here was a dealing not between the executor and third parties in the assets of the estate, but between debtor and creditor who stood at arms length toward each other—between the debtor who had a right to pay his debt and the executor who had the right to receive it. It is true the debtor could not compel the-executor to receive a depreciated currency in payment of his specie debt, and the executor ought to refuse to receive it. But if the executor chooses to receive it,, the debtor may pay it; for the latter cannot be presumed to know the condition of the estate or the-exigencies, which may be of such a character as imperatively to require the executor to collect the debts even in a depreciated currency.' So that the mere payment of a well secured specie debt by a debtor to a fiduciary to whom it is due, and who is willing to receive it, does not constitute the debtor a participator in the breach of trust committed by such fiduciary in receiving a depreciated currency in payment of a specie debt. In such a case the debtor does not get possession of any of the assets of the estate. He is not, as in Pinchará and Woods, or Jones and Clarhe(supra) a purchaser of a debt due the estate, and after the transaction, holds nothing belonging to the estate. He has simply extinguished a debt due the estate by .payment of the debt to a party entitled to collect it in-such currency (and at the time of payment the only- *503 currency in circulation) as the creditor is willing to receive. In such a case, in order to hold the debtor liable, there must be shown such facts and circumstances as amount to fraud and collusion.
In the case before us there is nothing to show fraud or collusion on the part of the debtors from whom the executors chose to receive in Confederate money specie debts due to their testator. And while we are bound to hold, upon the principles repeatedly declared by this court, that the executors in this case have committed a devastavit in collecting, as late as 1863, debts amply secured upon real estate, in Confederate money, depreciated to the extent of five to one, yet, for the reasons above stated, neither the debtors nor the real estate pledged for the payment of these debts can now be held liable to the legatees.
Much stress has been laid in the argument by several of the learned counsel upon the decision of this court in the case of Myers v. Zetelle, 21 Gratt. 733; and it is earnestly insisted that the principles therein announced must govern this case and relieve the executors from all liability. In Williams’ adm’rs v. Skinker & wife (supra) I had occasion to distinguish that case from the case of an executor who received Confederate money for a specie debt well secured upon ample real estate, where there were no debts to pay, and where the money was received and invested in Confederate bonds, without the consent of the legatee to whom it was payable, and who at the time was within the lines of the Federal army. I refer to the discussion of the subject in the opinion in that case to show the manifest distinction between that case and the case of an executor collecting a specie debt well secured in a greatly depreciated currency.
It is sufficient here to remark that the great point in *504 ^at case> the pivot, indeed, upon which the whole case turned, was the large and unlimited power and discretion conferred upon the agents, Myers &¡ Cridland, by mosj. sweeping and unrestricted power of attorney that it was possible by the use of words to confer. Thi3 court, speaking of the power of attorney under which the agents in that case acted, said (p. 740): <l The powers conferred by this instrument were of the most ample character. In addition to the enumeration of many particular powers, there are general clauses giving the widest scope to the powers conferred. For example, “to do, transact, execute and perform all proper, legal, equitable, needful and requisite acts, matters and things relative to any affairs, business and concerns of all and every kind whatever, none ex cepted or reserved; * * * it being meant and intended by me to authorize and empower my said attorneys, or either of them, to do every matter and thing for me in any right and capacity whatever which can possibly be devised or lawfully done, although the same may be omitted to be herein particularly set forth.” And again : “and moreover, in and about the premises to do, transact, execute and perform such other acts, matters and things as shall be deemed needful and most beneficial, as fully and effectually to all intents and purposes as I myself might or could do by being personally present.” It is difficult to conceive how any form of words or use of language could confer more ample powers or larger discretion than are conferred by this power of attorney.
In Myers and Zetelle the whole case hinged and turned upon this power of attorney. It gave to Myers & Cridland the authority to do everything that Zetelle “ might or could do if he had been personally present.” So that in point of fact the only ques *505 'tion was whether the agents had fraudulently exercised their extraordinary powers. No matter what they did, if it was done without a fraudulent purpose, without •any mala fides imputed or proved, they must be ab- • solved from all liability for loss resulting from their conduct, for their power and their discretion were unlimited and without restriction. '
But an executor or administrator has no such power •as this. Their powers (unless in the case of an executor specially conferred by the will of the testator) are limited and restricted by well settled rules of law. 'They of course have not the same power and the same ■discretion over the debts due to the estate as their testator or intestate. If they had they would be within the rule of Zetelle v. Myers. The testator or intestate may do what they please with their own. They may take in discharge of their debts a worthless currency, or may forgive every debt and surrender ■every obligation, but their personal representative cannot do this, or anything like it. The law requires them to collect the debts due to the estate, and they have no authority to release a solvent debt by taking one-fifth of what is due, as in this case. They have no authority to receive in payment of a specie debt a currency so greatly depreciated, unless it be shown that the emergencies of the estate require it, or the condition of the debtor makes it necessary, or that the ■estate will be benefitted by receiving a depreciated ■currency which may be used in the payment of debts ■or legacies.
As was said in Williams’ ex’ors v. Skinker: “ While of •course the executor has the general power to collect the debts due his testator, he certainly has no right to release a debt or to discharge a debtor of undoubted solvency of his whole obligation by receiving a part of *506 ^as no authority to receive in a depreciated1 currency a debt payable in specie, and well secured upon real estate ample in value to make it perfectlv „ . ■. . . „ ,, . . sate, unless tbe exigencies of the estate require it for-the payment of debts (or where there are no debts) those entitled to legacies or to distribution consent to . . receive it.
I am’ therefore, of opinion that the executors of Nicholas Mills (Charles S. Mills and Eobert E. Howison) in collecting, in the year 1863, specie debts, secured upon real estate, in Confederate money, have committed a devastavit for which they are personally responsible to the legatees, and that so much of the decree of the chancery court as relieves them (the-executors) from liability should be reversed.
I am further of opinion that neither the debtors who paid their debts in Confederate money to the executors, nor the real estate pledged for the security of their debts, can be held liable to the legatees; there being nothing in the record to show that the debtors fraudulently participated with the executors in the devastavit committed by them.
I am further of opinion that so much of the decree of the said chancery court as declares that the sale of' the real estate known as the “ Leigh street property,” “ made by the two executors, Eobert E. Howison and Charles S. Mills, was valid, and that their deed conveyed a good title to the purchasers thereof,” should be affirmed.
The cause should be remanded to the said chancery court to be further proceeded in, in conformity with the foregoing opinion.
The above is the opinion of Christian, J., delivered *507 when the eases were first considered by this court. To this he appends the following—
Note.—Upon the re-argument of this case, at November term 1876, Christian, J., was inclined to change his opinion, to the extent of holding the purchasers of the Exchange hotel property liable as well as the executors.
Anderson and Burks, J’s. concurred in the opinion of Moncure, P. .
Staples, J. concurred in the opinion of Christian, J.
Decree arrirmed.